[Civil No. 4547. Filed February 7, 1944.]

[145 Pac. (2d) 853.]

HUGH COLLINS, Personal Representative of the Estate of HUGH COLLINS, JR., Deceased, Appellant, v. RIVERSIDE AMUSEMENT PARK COMPANY, a Corporation, Appellee.

Mr. V. L. Hash and Mr. L. V. Rhue, for Appellant.

Messrs. Sloan, Scott & Green, for Appellee.

STANFORD, J.—Hugh Collins, the appellant herein, in his capacity as personal representative of the estate of Hugh Collins, Jr., deceased, brought this action for damages against the appellee for the death

of Hugh Collins, Jr., his son, on July 10, 1940, at a swimming pool operated by appellee south of the City of Phoenix.

The complaint alleged that the son was of the age of fourteen years, and was drowned through the negligence of appellee; admission was paid for by deceased for entering the park where the swimming pool was located; that because of the great depth of the water in said pool in one end of same, and because of the devices for diving and swimming operated in connection with the pool, and because of the rings suspended from a cable over and above the deep water, the pool was then and there a dangerous place for said boy; that the defendant carelessly and negligently failed to provide lifebuoys and water poles in said pool, or a lifeguard to be in constant attendance upon the said swimming pool to reasonably protect the patrons; that the appellee failed to have and maintain at such swimming pool any means of rescuing plaintiff's son at the time he fell into the deep water; and that while he attempted to swing from the aforesaid rings upon the said cable over the deep portion of said pool, which was approximately nine feet in depth, the said son did fall into the deep water and was drowned as a result of the carelessness and negligence of the appellee herein.

The appellee, in answering, denied that at said times it had constructed cables extending over the deepest part of said swimming pool to which were attached a large number of rings and in that regard alleged that at said time there was one cable stretched from the north to the south bank of said pool, approximately fifty feet from the east end of said pool, to which said cable was attached approximately five rings whereby patrons of said pool could swing from one ring to another across the water in said pool. Alleged that deceased entered the said

pool at about 9:00 A. M., on the 10th day of July, 1940, and deceased, together with his companion, continuously thereafter swam and played in and about said pool until his death at about the hour of 1:45 P. M.; that said Hugh Collins Jr., was an experienced swimmer; had previously used the pool on numerous occasions and was familiar with said pool; that the depth of the water was painted in large conspicuous letters or numerals at various intervals on the banks of the pool; that at all times when said pool was open to the public, it kept and maintained at or in the immediate vicinity of said pool one or more employees or attendants trained and skilled in rescue work, including artificial respiration, and that such an attendant or attendants was on duty at said pool throughout the day of July 10, 1940.

The appellee further pleads that at the time stated the said Hugh Collins, Jr., swung out on rings in said swimming pool and dropped feet first therefrom into the water and swam to the north bank, and there became affected with an attack or seizure in the body, the exact nature being unknown to appellee, and the said Hugh Collins, Jr., was immediately removed from said pool. The lifeguards commenced artificial respiration and revived him to some extent, and then he lapsed into unconsciousness; that when Collins was taken from the pool, appellee immediately called for a physician, together with the pulmotor rescue squad maintained by the City of Phoenix, both of which worked upon said boy for a period of several hours, but were unable to restore him to life. It is further claimed that the death was due solely and proximately to natural causes within the body of said Hugh Collins, Jr., deceased, and not to any act or omission of appellee.

In this case the trial court directed the jury to render its verdict in favor of the appellee herein.

Appellant submits but one assignment of error, which is as follows:

"That the court erred in directing a verdict for the defendant on the ground that plaintiff had not made proof of actionable negligence against the defendant."

The appellant contends that the court should not have taken the case from the jury unless as a matter of law recovery cannot be had upon any view which can properly be taken of the evidence, and, also, where the evidence is such that reasonably minded men differ as to the inferences to be drawn from the facts a jury question is presented.

The question, therefore, for us to determine is whether or not appellant made proof of actionable negligence in the submission of his case; the principal negligence relied on was the failure to have a lifeguard present in actual attendance with the necessary appliances to rescue persons who might submerge in the pool and be unable to extricate themselves therefrom.

Vernon Smith, who was called as a witness by appellant in the trial case, testified that he did not know the deceased, and further testified as follows:

"Q. That occurred at the Riverside Swimming Pool. And when did you first notice him there that day? A. I seen him in the water once before.

"Q. Saw him in the water once before. Now, then, did you see him at the time that he was in distress before he got out on the bank? A. No, he was right at the edge when I seen him first.

"Q. At the time you saw him he was right at the edge. Now, how did he get out of the pool? A. Well, two other boys and I grabbed him, pulled him out.

"Q. Two other boys and you grabbed him and pulled him out. Now, were those other boys Charles Robeda and Leonard Warmington? A. Yes, I believe those were the ones.

"Q. All right. Now, what did you do and what did they do when you got him out of the pool? A. Well, I sent them after the lifeguard when we pulled him out of the pool.

"Q. I see. Then what did you do? A. I started to try to perform artificial respiration on him.

"Q. I see. Now, will you tell the jury, so they will understand, just what you actually did, how you did it? A. Well, artificial respiration is, you lay them prone on their stomach and place their head and their hands so that their mouth is free and open, so that the water can come out, and press on the small of their back and contract and expand the lungs, which forces the water out of them.

"Q. I see. Well, now, Vernon, how did you happen to be at the pool that day? A. Well, I swam there quite often.

"Q. You had paid admission that day to go into the pool? A. Yes, sir.

"Q. Well, you say you sent the two boys, Warmington and Robeda, after the lifeguard? A. That is right.

"Q. Did they find him? A. No, they didn't find him.

"Q. Well, who did find him? A. I went and got him myself.

"Q. You quit giving him resuscitation and went to look for the lifeguard? A. That is right.

"Q. Did you find the lifeguard? A. Yes, sir.

"Q. Now, where did you find him? A. At the west end of the pool, by the small pool.

"Q. Was he in that small pool? A. Well, I am not sure, but I think he was in it.

"Q. I see. Then did you bring the lifeguard back with you? A. Yes, sir.

"Q. And what did the lifeguard do? A. He immediately began performing artificial respiration."

The other two persons referred to by said Smith, as the evidence shows, were Charles Robeda and Leonard Warmington, friends of deceased and who went there for swimming purposes also, and at the

time of this accident each of those two testified that they were on the north bank and pulled Hugh Collins, Jr., out of the pool.

Leonard Warmington, witness for the appellant, testified as follows:

"Q. He (meaning Robeda) had him by the left. All right. Now, tell the jury whether or not you got him out. A. Yes, we pulled him out.

"Q. All right. Then what was done after you got him out? What was the next thing that happened? A. Well, somebody came around and they told us to go for the lifeguard.

"Q. Well, do you know Vernon Smith? A. Yes.

"Q. Was he—tell the jury whether or not he was the man that came up. A. I think he was.

"Q. I see. Now, was there any lifeguard there at that time? A. No.

"Q. All right. Now, what did you do? A. Well, I just ran for a lifeguard, over to the box office.

"Q. Over to the box office. Now, how far is that from where Hugh was? A. I don't know; I imagine it is around thirty-five or fifty feet.

"Q. Well, when you went to the box office did you find the lifeguard there? A. No.

"Q. Then what did you do? A. Well, I just turned around and came back.

"Q. Came back to where Hugh was? A. Yes.

"Q. All right. When you got back who was there with you—anyone? A. I didn't see anyone. I wasn't right there.

"Q. Well, did you come back to where Hugh was? A. Well, not exactly to the spot; I was still looking for the lifeguard.

"Q. What? A. I was still looking for the lifeguard."

Charles Robeda, witness for the appellant, testified as follows:

"Q. Well, as he reached the bank what was done? A. Well, at first when Leonard—when we found out something was wrong, Leonard ran out to the end

of the diving-board and reached out, but Junior didn't pay no attention to him, and he swam right—paddled right by us, so I ran over to the lifeguard's chair, and when Junior got there he started to slide under and I grabbed one arm and Leonard came over and helped me.

"Q. Leonard got hold of the other arm, did he? A. Yes.

"Q. Now, then, did you boys pull him out of the water? A. Yes.

"Q. When you got him out was he limp or was he able to sit up? A. He was very limp.

"Q. And what did you boys do then? A. Well, we—first he was on his back, and then we turned him over on his stomach.

"Q. I see. Do you know Vernon Smith? A. Yes, sir.

"Q. Was he there at that time? A. Yes, sir.

"Q. Well, was there anyone then there except Hugh and Leonard and Vernon Smith? A. I think that is all.

"Q. What is that? A. That is all I seen.

"Q. That is all you saw. All right. Now, then, what was done by each of you three boys? What did Vernon Smith do and what did Leonard do and what did you do? A. Well, I believe Vernon Smith started giving him artificial respiration.

"Q. I see. A. And then he told us to go after the lifeguard.

"Q. What did you do then? A. We started after him.

"Q. Well, you say 'we.' You and Leonard? A. Yes, sir.

"Q. All right. Where did you go? A. Well, we went—I went to west, and he went east.

"Q. All right. Now, did you look for him? A. Yes, sir.

"Q. Did either of you find him? A. No, sir.

"Q. All right. Now, specifically where did you go to? A. I went around on the east—on the west side of the pool.

"Q. Yes. A. And I didn't find him there, around. where the big diving-board is.

"Q. And then what next did you do, Charles? A. We came back. And then Vernon Smith found him, I believe."

Tom Taylor, who was a lifeguard, and witness for the appellee, testified as follows:

"Q. Do you recall an accident that happened to Hugh Collins? A. Yes, I do.

"Q. What time of day did that occur? A. Approximately one-thirty.

"Q. Where were you at the time? A. I was off for lunch at the occurrence of the accident.

"Q. Where were you? Where were you at the particular moment? A. I was sitting on the counter at the concession stand.

"Q. How far is that from the pool? A. Well, in actual feet I couldn't say, but probably possibly the length of this room or maybe half again the length of this room.

"The Court: This room is sixty-five feet. That would be, then, would you say, around a hundred feet? A. Well, say approximately ninety feet.

"Mr. Scott: Q. What had you been doing immediately previous to that? A. I had just gotten onto the rings that were on this cable above the pool. I had swung out on all five of the rings and back to the bank and then dove into the pool and looked around and I saw Hugh Collins take hold of the rings, which he frequently played on, and I swam to the end of the pool, just about to the end where the ladder was, and got out and then went to the counter at the concession stand.

"Q. What then occurred? A. I sat there for just a second while a friend read me a letter, a card he had gotten from one of the boys that used to work there, and while he was reading that post card one of the small boys that was with Collins—I don't remember—with Hugh Collins—I don't remember his name, but I know one of the boys ran up and says, 'Where is Kelly?' He was the lifeguard. And I

said, 'I don't know. What has happened?' He said, 'There is an accident here.' And so I ran out immediately to where the boy was.

"Q. You ran over there immediately where the boy was?  A. Yes, sir.

"Q. What did you observe when you got there? A. When I got there the boy had been pulled from the pool and he was just—I rolled him—Well, Vernon Smith had him out of the pool, out of the water. I don't know just who pulled him out; some of the boys there. And I applied artificial respiration and—

"Q. Well, what was Vernon Smith doing? A. Vernon Smith was giving him respiration at the time.

"Q. Then what did you do then?  A. Then I gave him respiration and told Vernon Smith to run and get Kelly, and Kelly came and—within just a second; I don't know how quick—and I told—and Kelly gave him artificial respiration while I summoned the pulmotor squad immediately, and someone had phoned them before that."

Stephen Kelly, who was also a lifeguard, testified for the appellee as follows:

"Q. Where were you when you first heard of the incident?  A. I was at the west end of the pool, on a strip of ground between the two, the large pool and the small pool.

"Q. What were you doing?  A. Well, there were some boys that were cleaning out this small pool, and I had gone down there to look, to see how they were doing and what they were doing.

"Q. Was the large pool within your vision?  A. Yes, sir.

"Q. All of it?  A. All of it.

"Q. And including the place where Hugh Collins was taken out of the pool?  A. Yes, sir.

"Q. Was all of the so-called rings and cable across within your full vision?  A. Yes, sir.

"Q. What did you hear or do?  What attracted your attention to this particular incident?  A. Well, the first thing I heard was 'Lifeguard,' and as I turned around, why, Vernon Smith was hollering

my name and running towards me, and I started running towards him until he told me to come around to the point where Hugh Collins was.

"Q. How far away were you from where Hugh Collins was in the pool, roughly? A. Oh, roughly I was about a hundred and ten feet.

"Q. And did you go immediately there? A. Yes, I did.

"Q. And what did you find when you got there? A. I found Hugh Collins was lying prone on the sidewalk, with his face on his arm, on his left arm, and his right arm to one side, and Tommy Taylor was giving him artificial respiration, and when he saw me coming he got up."

■■ In the case of *Larkin* v. *Saltair Beach Co.*, 30 Utah 86, 83 Pac. 686, 690, 3 L. R. A. (N. S.) 982, 116 Am. St. Rep. 818, 8 Ann. Cas. 977, which seems to be a case that is quoted very frequently in matters of this nature, we find the following:

" . . . It is well settled that the owners of resorts to which people generally are expressly or by implication invited to come are legally bound to exercise ordinary care and prudence in the maintenance and management of such resorts to the end of making them reasonably safe for the visitors. And when the business is that of keeping or carrying on a bathing resort, the authorities hold that the proprietors or owners thereof are not only required to exercise that same degree of care and prudence with respect to keeping the premises in a reasonably safe condition, which the law imposes upon keepers of public resorts generally for the protection of their patrons, but the law imposes upon them the additional duty, when the character and conditions of the resort are such that because of deep water or the arising of sudden storms, or other causes, the bathers may get into danger, of having in attendance some suitable person with the necessary appliances to effect rescues, and save those who may meet with accident. Not only is it the duty of the owners of bathing resorts to be prepared to rescue those who

may get into danger while in bathing, but it is their duty to act with promptness, and make every reasonable effort to search for, and, if possible, recover those who are known to be missing.''

■ The case of *Davis* v. *Boggs,* 22 Ariz. 497, 199 Pac. 116, 119, cited by appellant, is a case where error was assigned to the denial of the defendant's motion for an instructed verdict in its favor. The decision was written by the late Justice A. C. Baker, and from that case we quote the following:

"It necessarily follows from what has been said that it was not error for the court to deny the motion of the defendant for an instructed verdict. We have often decided that a verdict will not be directed in a case where the evidence is conflicting or where on all the facts and circumstances proven there is room for fair and sensible men to differ in their conclusions. Of course, it was for the jury to say whether the negligence found was the proximate cause of the accident.''

From the case of *City of Longmont* v. *Swearingen,* 81 Colo. 246, 254 Pac. 1000, 1002, we quote the following:

"It is urged, however, that there was no evidence that the defendant's negligence was the proximate cause of the death. While it is true that there was no direct evidence that, if a lifeguard had been present, death would not have resulted, yet we think the facts and circumstances proven were sufficient, together with the inference which may logically be drawn from the evidence, to justify the finding that a failure to have a life guard there was the proximate cause of death.

"All that is necessary to warrant the finding of proximate cause is to establish by the evidence such facts and circumstances as would indicate with reasonable probability that the death was caused by drowning, which resulted from the negligence of defendant in not having a life guard present, because

from this evidence it may fairly and logically be inferred that, had a life guard been present, death would not have resulted. The casual connection may be established by the circumstances. Proximate cause is a question for the jury. *Tadlock* v. *Lloyd,* 65 Colo. 40, 45, 173 Pac. 200.

"That the absence of a life guard, in the circumstances shown here, may be negligence, cannot well be disputed, and we think is sustained by the authorities. (Citing cases.)

"To require direct evidence that, if a life guard had been present, death would not have resulted, would be to exact evidence which it would be impossible to obtain, and would result in a denial of justice."

From the case of *Ettlinger* v. *Collins,* 25 Ariz. 115, 213 Pac. 1002, 1005, we quote the following:

"It is within the authority of a trial judge to withdraw a case from the jury when there is no proper evidence to support the issues, or he may direct a verdict for failure of the evidence, or, where the evidence is uncontroverted or beyond all reasonable probabilities, but where there is any competent evidence which tends to support the plaintiff's case, a motion for a directed .or instructed verdict should be denied. . . . "

Appellee submits the case of *Flora* v. *Bimini Water Co.,* 161 Cal. 495, 119 Pac. 661, and in that case the court, in part, said:

"The principal contention on this appeal is that the evidence is insufficient to sustain the findings negativing negligence on the part of the defendant. . . .

"The mere fact that a drowning occurred, regrettable though it be, is not, of course, conclusive proof of negligence. Nor can it be said that the defendant was, as a matter of law, bound to have a guard stationed in immediate proximity to the deep water end of the pool. It was possible that bathers at

other points might get into positions of danger, and it was for the court below to determine, under all the facts, whether the arrangements made were reasonably adapted to the end of protecting the defendant's patrons, and were such as an ordinarily prudent person, situated as defendant was, would have made.''

This case was tried before the court without a jury.

The case of *Lyman* v. *Hall,* 117 Neb. 140, 219 N. W. 902, 903, was an action against the proprietor of a bathing pool for damages for negligence resulting in the death of a boy named Richard Lyman, and it lays down this rule:

''Ordinary care to provide a reasonably sufficient number of attendants for the protection of bathers at a public bathing resort conducted for private gain is a standard of duty in that respect.''

We find this to be a case that went to the jury and a verdict was rendered for the sum of $5,000 which was reduced by *remittitur* to $3,000. The court further said in that case:

''Evidence of negligence does not of itself establish a cause of action, but in addition plaintiff must show that negligence pleaded by him was the proximate cause of the alleged injury.''

The case of *Nolan* v. *Young Men's Christian Ass'n,* 123 Neb. 549, 243 N. W. 639, 640, is a case where Nolan, twelve years of age, was accidentally drowned while engaged with a troupe of boy scouts, using the swimming pool of the appellee. The court in that case said:

''The principal assignment of error relied upon by the plaintiff is that there was evidence of actionable negligence sufficient to require the submission of the case to the jury. There is no conflict in the evidence upon the issues of negligence. 'Issues of negligence are questions for the jury only when the

evidence is sufficient to sustain a finding of negligence.' (Citing cases.) It is the duty of the court in a suit for damages, based upon negligence, to direct a verdict for the defendant upon the conclusion of all the testimony if the evidence is insufficient to support a verdict for the plaintiff.''

Aside from the foregoing cases cited, the appellee herein has cited a great many cases, among them being many Arizona cases: *Baker* v. *Maseeh,* 20 Ariz. 201, 179 Pac. 53; *Blue Bar Taxicab & Transfer Co.* v. *Hudspeth,* 25 Ariz. 287, 216 Pac. 246; *Lutfy* v. *Lockhart,* 37 Ariz. 488, 295 Pac. 975; *Peters* v. *Pima Merc. Co.,* 42 Ariz. 454, 27 Pac. (2d) 143.

Much was said about the negative evidence to the effect that witnesses saw no lifeguard, but it is our opinion that the best evidence that there was no lifeguard at the time the boy was taken from the pool is that he was helped out of the pool by two friends, and the guards themselves testified that they were not at that time present. Tom Taylor testified, as heretofore mentioned, that he was off for lunch at the time of the accident about ninety feet away and one of the boys who was with Collins ran to him and asked: ''Where is Kelly?'' He further said: ''He is the lifeguard.'' And in response to that Taylor said: ''I don't know. What has happened?'' He said: ''There is an accident here.'' Then Taylor said he ran immediately to where the boy was.

The case of *Allison* v. *Davidson,* Or., 141 Pac. (2d) 530, 531, is where an action was brought

'' . . . to recover for injuries sustained when defendants' mechanic accelerated the motor of an old automobile, that plaintiff and his two companions had brought to defendants' auto repair shop, and a blade of the cooling fan flew off and struck plaintiff in the face seriously injuring him. From a judgment in favor of plaintiff, defendants appeal. . . .

"Errors are assigned in the refusal of the trial court to grant an involuntary nonsuit, direct a verdict for the defendants or enter judgment for defendants notwithstanding the verdict; . . . .

"In considering the question whether an order of nonsuit, one directing a verdict for the defendants, or rendering a judgment for defendants, nothwithstanding the verdict, should have been made, we must bear in mind that 'The question of negligence must be submitted to the jury as one of fact, not only where there is a conflict in the evidence with relation to the existence of the facts from which it is proposed to infer negligence, but also where there is room for difference of opinion between reasonable men as to the inferences which might fairly be drawn from conceded facts.' "

█ We hold that the evidence was too conflicting for the court to direct a verdict, and the case should have been decided by the jury.

The cause is reversed and remanded for new trial.

McALISTER, C. J., concurs.

ROSS, J. (dissenting).—I dissent from the majority of the court.

There were five doctors who testified in this case. Three of them said deceased Collins did not die from drowning and one that he did, and the fifth expressed no opinion on that point, but granting he was drowned (which is very questionable), was it through any fault or negligence of defendant? The pool in which deceased met his death was furnished with the very best of equipment. He was a good swimmer and familiar with the pool and had been in it many times before. The over head rings, from which he fell or released himself into the water, were standard equipment placed for the use of swimmers. After he dropped from the ring into the water, with some effort he managed to reach the north

side of the pool where he was assisted by his companions out of the water and placed on the sidewalk. His companions were Leonard Warmington, 15 years old, and Charles Robeda, 14, who testified they lifted him out of the water and stated that he looked like he was choking and that he was muttering something at the time. Vernon Smith, who was present at that time, was asked what he did and he said he administered artificial respiration by laying deceased prone on his stomach and placing his head on his hand so that his mouth was free and open and pressed him on his back to force the water out. He said he sent Leonard and Charles after the lifeguard. These boys say they did not find or see the lifeguard, but the evidence is that Tom Taylor (who was not on duty at the time) was at the lunch counter approximately ninety feet from where deceased was, and he testified one of the boys that was with Hugh Collins (Warmington and Robeda) "ran up and says, 'Where is Kelly?'—He said, 'There is an accident here.'" Taylor said he ran immediately to where the Collins boy was, that "Vernon Smith had him out of the pool, out of the water," and was giving him respiration at the time. Taylor said, "Then I gave him respiration and told Vernon Smith to run and get Kelly, and Kelly came and—within just a second; I don't know how quick . . . and Kelly gave him artificial respiration while I summoned the pulmotor squad immediately, and someone had phoned them before that." Steve Kelly, when he first heard of the accident, was at the west end of the pool at the shallow pool used for children, but the main pool including the rings where Collins was, was clearly within his vision. While there he heard someone holler "Lifeguard" and as he turned around, Vernon Smith was calling his name and running toward him; that he was about 110 feet from

where Collins was; that he went immediately and "found Hugh Collins was lying prone on the sidewalk, with his face on his arm, on his left arm, and his right arm to one side, and Tom Taylor was giving him artificial respiration." This witness says Collins' jaws were in a rigid condition and that he put his fingers between his teeth and relieved that condition. He further testified:

" . . . As I gave him respiration, with each pressure he would breathe with me, and it was only a matter of a very few pressures that he groaned audibly and attempted to raise himself up on an elbow, on the elbow that was under his head, and I felt that he was breathing and started to turn him over and treat for shock when he vomited, regurgitated, and then he seemed to be choked up after doing that and I gave him further respiration till that was clear, and then he was breathing again and groaning again and I started to turn him over when he suddenly went limp or collapsed. Then I started respiration again and continued that until such time as the pulmotor arrived."

This witness had been a lifeguard for a number of years in both California and Arizona and his qualifications are not questioned. The testimony shows that skilled and experienced lifeguards were on duty on the 10th day of July, and that they did everything possible to help Collins, and that what they did was the right thing to do.

The evidence of plaintiff's witnesses does not establish a conflict with that of the defendant as to the presence of the lifeguards and the prompt and efficient assistance given deceased.

Charles Robeda, when asked if the guard was around the pool, evasively answered: "I didn't see him. I guess he was around there, but he wasn't where I was." This witness corroborates Tom Taylor, who said Vernon Smith went to look for a guard

and "found him." Leonard Warmington whom Vernon Smith also sent to look for a guard, testified when he returned a lifeguard was "already there." Virginia Swank said she did not see any lifeguard on the premises, but explained on cross-examination she meant she did not see anyone with the markings of a lifeguard on his clothes. It was explained by the defendant's manager that lifeguards purposely did not wear distinguished bathing suits to avoid too much attention by some of the women patrons of the pool.

At the close of the case, the evidence being as I have stated, the court instructed the jury to return a verdict for the defendant, and it seems to me the action of the court should be sustained.