ALBERT LANGHEIM, Administrator, Appellant, v. DENISON FIRE DEPARTMENT SWIMMING POOL ASSOCIATION, Appellee.

No. 46702.

JANUARY 8, 1946.

REHEARING DENIED MARCH 13, 1946.

R. K. Brannon and L. W. Powers, both of Denison, for appellant.

Floyd E. Page, of Denison, for appellee.

OLIVER, J.— The Denison Fire Department Swimming Pool Association is a corporation not for pecuniary profit, organized in 1926 under chapter 394, Code of Iowa, 1924 (1939). Its members are members of the Denison Fire Department and such other persons as may by the bylaws be permitted to join. Apparently its principal purpose was to build and operate a public swimming pool and it was empowered to conduct concessions, athletic games, parking privileges, and transportation of the public to and from the places of amusement.

The Association secured $3,000 by issuing noninterest-bearing certificates of indebtedness to various residents of Denison. Other substantial sums were borrowed from a bank and some funds were received from an unincorporated firemen's association. These moneys were applied toward the construction of a public swimming pool and bathhouse. The balance of the contract price has been paid from the earnings of the swimming pool. The money borrowed from the bank has also been paid from earnings. The noninterest-bearing certificates, to which some witnesses refer as donations, have not been paid. Additional net earnings which have accumulated have been set aside for improvements to the swimming pool. No profits have been distributed to members of the

association and members have done some work in filling and cleaning the pool without charge. Its officers are not paid for their services as such.

Lifeguards and attendants for the pool were hired and newspaper advertisements and posters circulated by the Association. These emphasized the element of safety and recited, "lifeguard on duty at all times." The charge for admission to the pool to persons who furnished their own bathing suits was twenty-nine cents for adults and nineteen cents for children. It was usually open from 1 p. m. to 10 p. m. daily. On Thursday mornings children were admitted without charge.

The Red Cross arranged with the Association for the use of the pool by groups of children from neighboring towns, on certain mornings when the pool was less used and the Swimming Pool Association was able to make them a better rate. The charge was ten cents per child and was paid by the Red Cross. The representative of the Red Cross testified he was told that Sandy McHenry and Bill Norelius were to be the lifeguards at the pool and that there never was any talk at any time that the lifeguard was to abandon his post of saving life and looking after the welfare of these children and devote himself to instruction. He also testified:

"The object of these classes was instruction in swimming. There was never anything said at any time that there would be two lifeguards on duty at the time they were being instructed. I understood that instruction would be given by one of the lifeguards and I understood that the lifeguards were to be Sandy McHenry and Bill Norelius."

The president of the Swimming Pool Association testified that children who could not swim were to be kept "in that area of water where it was safe to instruct anybody that can't swim."

The pool is one hundred forty-four feet long north and south and sixty feet wide and the water varies in depth from six inches at the north end to nine feet at the south end. About thirty-six feet from the south or deep end of the pool is a rope which extends across the pool and separates the deep end of

the pool from the shallow part. At the deep end of the pool is an elevated seat for a lifeguard.

About 9 a. m. July 19, 1943, forty-eight children sent from Manilla by the Red Cross entered the pool. One of these was the decedent, Beverly Langheim, aged thirteen years.

The lifeguard for the Swimming Pool Association on duty at that time was William (Sandy) McHenry, aged sixteen years and eleven months. He was the only attendant in charge of the forty-eight children in the swimming pool. McHenry was an experienced swimmer who held a junior lifesaving certificate and shortly thereafter passed the senior lifesaving test.

He first required that all the children try to swim across the pool. Then he divided the children into three classes and placed those he considered to be the better swimmers south of the rope at the deep end of the pool, those who could not swim well in the section immediately north of the rope, and the nonswimmers in the very shallow section at the north end of the pool.

A companion testified Beverly Langheim could swim only about three fourths of the distance across the pool and immediately went to the north end. Another witness testified she swam across the pool. McHenry testified she swam across the pool and two thirds of the way back, that:

"She was just fatigued and that was all and she just couldn't make it and was just tired out; and she was close to the rope and grabbed ahold of the rope and was going to rest awhile; and seeing that she couldn't make it, I didn't think she was qualified enough to stay down in the deeper water because she wasn't in condition for it, and I motioned for her to go across to the other [north] side [of the rope]."

The children were jumping from the sides of the pool into the water, jumping up and down in the water, splashing water, and playing tag. "There was a lot of yelling and noise." Some of the children saw Beverly playing in the water at times, north of the rope, at the rope, and south of the rope in the deeper part of the pool. Apparently she was last seen about one-half hour before the children left the pool.

Meanwhile McHenry was instructing the children in swimming. Witnesses testified he was teaching first in the shallow end of the pool. After he finished giving instructions in the shallow end "he was showing how to dive and doing sidestrokes and other ways of swimming."

William McHenry testified for defendant:

"There were usually three different categories of swimmers and I tried to give each group about half an hour. Whenever I am instructing or talking to them and having them do something that I don't need to talk to them I look around and just generally survey the pool. I try to do that as much as possible * * * I was instructing first in the shallow end 'of the pool for about one-half hour. That was just in swimming and of course, during the time I was engaged in that instruction, my attention was directed toward these people who were taking the lessons. I was watching to see how they were doing and explaining to them how it should be done. Then I moved to the midsection of the pool. It is still in shallow water, just below the rope. While I was instructing them, I was likewise directing my attention to how they were performing and teaching them and showing them how to do it. Then finally I moved to the deep end.

"When I moved down to the deep end of the pool, I was instructing in swimming first. The diving instruction was just impromptu. It really isn't included. I didn't get into the water to demonstrate these various strokes, but I was watching them to see whether they were doing it correctly and then tell them and point out to them wherein they were failing to do it correctly. * * *

. "Mr. Norelius wasn't there that day at all. He came down later on in the morning. He wasn't there during the instruction period. There was no attendant there except me."

The children came out of the pool at about 11 a. m. One boy took a last dive into the deep end of the pool and saw what he thought was a bathing cap. He reported this to McHenry, who was then standing in the bathhouse at the side of the pool talking to the matron who had charge of towels and tickets. McHenry assumed the boy had seen a towel and

the matron suggested it be recovered. McHenry dived into the pool and discovered the drowned body of Beverly Langheim. Efforts to resuscitate her by McHenry, and doctors and others who were promptly called, proved unavailing.

Thereafter the administrator of Beverly's estate brought this action for damages against the Swimming Pool Association, based upon its alleged negligence in not providing a competent lifeguard to constantly watch over the children while they were in the water. At the conclusion of the evidence the court sustained defendant's motion for directed verdict on the grounds that (1) defendant is exempt under the rule exempting a charitable organization from liability for the negligence of its servants and (2) plaintiff failed to establish actionable negligence on the part of the defendant or to establish that any act or omission of defendant was the proximate cause of Beverly's death.

From the judgment on the verdict so returned plaintiff has appealed. The grounds upon which the verdict was directed will be considered in inverse order. The evidence bearing upon the negligence charged should be considered in the light most favorable to plaintiff.

I. One operating a swimming pool or other place of public amusement to which an admission fee is charged is required to exercise ordinary or reasonable care to guard against injury to his patrons. Hecht v. Des Moines Playground and Recreation Assn., 227 Iowa 81, 287 N. W. 259; Dahna v. Clay County Fair Assn., 232 Iowa 984, 6 N. W. 2d 843. An operator of a swimming pool, in discharging the duty of ordinary care for the safety of patrons, may be obliged to keep someone on duty to supervise bathers and rescue any apparently in danger, but the standard of his duty in this respect is only to exercise ordinary care to provide a reasonably sufficient number of competent attendants for such purpose. 52 Am. Jur. 315, section 71; Lipton v. Dreamland Park Co., 121 N. J. Law 554, 3 A. 2d 571; Pickett v. City of Jacksonville, 155 Fla. 439, 20 So. 2d 484; Rovegno v. San Jose Knights of Columbus Hall Assn., 108 Cal. App. 591, 291 P. 848; Collins v. Riverside Amusement Park Co., 61 Ariz. 135, 145 P. 2d 853;

Lyman v. Hall, 117 Neb. 140, 219 N. W. 902; Lindsey v. De-Vaux, 50 Cal. App. 2d 445, 123 P. 2d 144.

In the case at bar defendant undertook to supervise and guard forty-eight strange children, most of whom were unable to swim or were not good swimmers, with one attendant, whose principal duty apparently was to instruct the children in swimming. There was evidence that defendant knew Beverly could not swim well. The jury could have found also that McHenry did not properly watch the pool and supervise and guard the children bathing therein. That this may have been due to McHenry's preoccupation with his duties as swimming instructor would not render defendant less responsible therefor.

The president of the Swimming Pool Association testified there was a tower at the deep end of the pool:

"When the pool is in operation and open to the public, a lifeguard is supposed to be there. I would judge that tower is about five feet, maybe six feet off the ground, where he sits. That tower immediately overlooks the deep end of the pool. I think it is elevated so as to give a little better effect to the public and that he is more conspicuous there and has a little better view of the pool. He is, in effect, looking down."

If we correctly understand the record, McHenry at no time occupied the elevated lookout seat provided for the lifeguard. We do not say that the proper performance of his duties requires a lifeguard to continuously occupy the post provided for him or that he may not properly give attention to some other duties which do not materially interfere with his duties as lifeguard. But in determining whether defendant exercised ordinary care to provide a reasonably sufficient number of lifeguards, the fact that the other duties of the guard apparently prevented him from occupying the lifeguard's seat is an element to be considered in connection with the other evidence.

Hecht v. Des Moines Playground and Recreation Assn., 227 Iowa 81, 287 N. W. 259, relied upon by defendant, is not here factually in point. In that case the playground association had a competent lifeguard constantly on duty in his seat at the deep end of the pool, from which he had an unobstructed

view. His only other duty was to take admission tickets. He testified he was at all times observant of the bathers. The playground association had been asked to furnish swimming instructors for the group of which the drowned boy was a member, and had directed them to the Red Cross, which had specially supplied them with two competent swimming instructors and lifeguards for their own special use. The group had other adult attendants. No witness saw the deceased boy enter the pool or saw him in the pool. He was under the supervision of adults who had more direct and complete control over him than the agents and employees of the playground association. There was no evidence that defendant knew the drowned boy was unable to swim. The Hecht opinion quotes from Henroid v. Gregson Hot Springs Co., 52 Mont. 447, 455, 158 P. 824, 825, as follows:

''Other things being equal, the defendant would owe a higher degree of care to the boy whom it knew could not swim, and who was permitted in the pool, than to one whom it knew could swim. In other words, the ability to swim or the lack of it would be an important factor in the sum of all of the circumstances which determine what is and what is not ordinary care. We think this is the theory upon which the complaint proceeds—the theory upon which recovery is sought—and if the evidence tended to show that this defendant knew, or by the exercise of ordinary care should have known, that Leo Henroid could not swim, it might be conceded, for the purpose of this appeal, that a prima facie case would be made out * * *.''

The evidence in the case at bar was sufficient to warrant a finding that Beverly Langheim and other children who were unable to swim well would be in danger whenever they were permitted to go into the deep water south of the rope; that defendant knew this and that in furnishing only one attendant or lifeguard, whose efforts were devoted largely to instructing groups of children in swimming rather than to the duties of a lifeguard, defendant failed to exercise ordinary care to provide a reasonably sufficient number of competent lifeguards to supervise said children and rescue any apparently in danger.

The evidence would have warranted a finding also that

the negligence of defendant, if established, was the proximate cause of Beverly's death. Plaintiff produced expert testimony that people do not drown without struggling and that a competent lifeguard, in a proper position, can readily recognize such a struggle. However, the effect of that evidence need not be determined. It is clear the jury would have been justified in finding that Beverly's death resulted from her going across the rope and into the deep end of the pool.

A lifeguard who observes a bather in peril should effect a rescue though the bather may not yet be drowning. Whenever Beverly or any other child who could not swim well went into the deep section of the pool south of the rope such child was in apparent danger. McHenry testified that when he observed such children in this danger zone he sent them back into the shallow water. On this fatal occasion McHenry apparently did not see Beverly going from the section north of the rope to the deep end of the pool. The jury could have found that a competent lifeguard (on duty as such and not overburdened with other duties) who was properly performing such duties would have seen and rescued her and that the failure of defendant to provide such supervision was the proximate cause of her death. See authorities hereinbefore cited.

██ II. The trial court held "defendant is an organization of such character that the question of its liability shall be ruled by the rule applying to hospital and charitable organizations, and is exempt under the rule from liability for the negligence of its servants." Andrews v. Young Men's Christian Assn., 226 Iowa 374, 284 N. W. 186, is a leading Iowa case which contains a detailed consideration of the question of the immunity of a public charity institution from liability for its negligence. In that case defendant was held liable under an exception to the rule. However, the decision refers with approval to various authorities which criticize the rule and the reasons advanced in its support. Reference is also made to numerous exceptions established by courts in decisions, which, though nominally adhering to the doctrine of immunity, in fact deny that doctrine.

President and Directors of Georgetown College v. Hughes, 76 U. S. App. D. C. 123, 130 F. 2d 810, 827, is an exhaustive

decision written by Judge Rutledge, denying the right of a charitable corporation to such immunity. The decision points out that for negligent or tortious conduct liability is the rule and immunity the exception. It notes that the rule of immunity has not held in the test of time and decision; that it has been devoured in "exceptions"; that the debate has been not so much as to whether, but concerning how far, it should be "modified," with ever widening modifications, which in some instances have resulted in its disappearance. It states:

"The rule of immunity is out of step with the general trend of legislative and judicial policy in distributing losses incurred by individuals through the operation of an enterprise among all who benefit by it rather than in leaving them wholly to be borne by those who sustain them. The rule of immunity itself has given way gradually but steadily through widening, though not too well or consistently reasoned, modifications. It is disintegrating. Each modification has the justification that it is a step in result, if not in reason, from the original error toward eventual correction. As more and more steps are taken, correction becomes more complete. The process is nearing the end. This leaves the steps untaken standing out as the more anomalous." See, also, 10 Am. Jur. 687, 688, section 140.

In the case at bar the precise question is not whether we are prepared to discard the doctrine of immunity from liability for negligence of public charity institutions, but whether defendant is such an institution. The cited authorities indicate the tendency of the decisions to limit or abrogate such doctrine. Any enlargement of the doctrine would be contrary thereto.

This court determined the proposition here involved in Clark v. Monroe County Fair Assn., 203 Iowa 1107, 1108, 212 N. W. 163, 164, which states:

"The first question urged on our attention is that the fair association is a corporation of such a character that it is not liable for negligence. In any event, this defendant is a corporation not for pecuniary profit, organized under Sections 1642, 1644, and 1645, Code of 1897, with amendments thereto. This question has never been before this court in its present form.

In Williams v. Dean, 134 Iowa 216, we had before us, in principle, the same question here involved; but that was an action against the officers of the corporation, and not against the corporation itself. We there held the officers not liable, and specifically refused to pass upon the identical question we have before us in this case, as to the liability of the association itself. The Ohio Supreme Court had this question before it in the case of Dunn v. Agricultural Soc., 46 Ohio St. 93 (1 L. R. A. 754). It was there urged, as in the instant case, that the society was that kind of a corporation that the law excuses from liability for the torts of its officers or employees. Under their statute, as under ours, they are a voluntary association, being the free choice of their constituent members, and the corporation was brought about by their active procurement, and they are not compelled to incorporate, and the state does not control their conduct. They are absolutely free to have these horse races or not, as they may elect, and the whole management and conduct of the fair is committed to the corporation and its officers; it selects its own agents and conducts its own affairs, the same as any corporation. They voluntarily elected, as such, to have this among their harness races on the track. They invited the patronage of the general public, to see the exhibitions at the fair, as well as to be amused by the racing on the track. They charged entrance fees for admission to the fair, and neither the state nor any part thereof ever received any of the proceeds of said fair. Whatever surplus there may have been above the expenses would belong to the association, and, on dissolution, the statute provided that the dividend would be divided among the shareholders.

"It is our opinion that this association is not an arm of the state, within the meaning of this term as used in Hern v. Iowa St. Agric. Soc., 91 Iowa 97; Morrison v. Fisher, 160 Wis. 621 (152 N. W. 475); and similar cases. Courts have gone so far as to hold, as to state fair associations, that, while they are considered favored by the law, and considered an arm of the state, yet there are circumstances under which they may be held liable for negligence. See Lane v. Minnesota St. Agric. Soc., 62 Minn. 175 (29 L. R. A. 708, and authorities cited).

These associations cannot be classed, nor are they ruled by the same rule, as hospital and charitable corporations.''

Perhaps it should be noted that some of the decisions cited in a later division of the Clark case are swimming-pool cases.

In Tri-State Fair v. Rowton, 140 Tenn. 304, 308, 204 S. W. 761, 762, L. R. A. 1918F, 657, the court said:

''The fact that private profit is excluded is not the true test of a charitable corporation or of the grant of the immunity here asserted. * * *

''In the pending case there appears no gift of a founder for the perpetual distribution of bounty to beneficiaries. The chief sources of income for the conduct of the association's business are in receipts from admission fees, charges made for concessions, and entrance fees to exhibitors. It is true that business men of the city of Memphis make donations towards the defendant's current expenses, from time to time, as motives of patriotism or self-interest may prompt, and this fact appears to be unduly stressed by the court of civil appeals as a factor deflecting its ruling in favor of the fair association.

''The strongest argument in defendant's behalf is that its mission is educational, and therefore that it must be treated as a public charity. It appears that exhibitions of live stock, farm products, handicraft, machinery, etc., are among the purposes of the association, and such do doubtless tend in one sense to educate or instruct certain members of the public. But, so also do many other promotions along the line of athletics, theatricals, etc. The primary object, however, is not to educate but to amuse and afford recreation.''

The statements made in Clark v. Monroe County Fair Assn., supra, relative to the organization, conduct, activities, and status of that corporation are applicable to defendant in the case at bar. Swimming pools for the use of members of the general public upon payment of admission charges are in the same category as theaters, race tracks, fairs, and other public amusements. Such amusements are not classed as public charities. That on certain mornings children are admitted to defendant's swimming pool without charge does not change

the character of the enterprise. Many profit corporations such as baseball clubs follow this practice. We adhere to the decision in the Clark case, supra, that, ''These associations cannot be classed, nor are they ruled by the same rule, as hospitals and charitable corporations.'' It follows that defendant is not immune from liability for negligence.

This conclusion makes it unnecessary to consider plaintiff's contention that the negligence of defendant in the selection of employees, and also that defendant carried liability insurance, brought the case within certain exceptions to the immunity rule.—Reversed.

BLISS, C. J., and HALE, GARFIELD, WENNERSTRUM, SMITH, MANTZ, and MULRONEY, JJ., concur.