No. 41,335

CARLOS PERRY, By and Through HOMER PERRY, His Father and Natural Guardian, *Appellee,* v. TERRY LEE SCHMITT, *Appellant.*

(339 P. 2d 86)

Opinion filed May 16, 1959.

*Charles Vance,* of Liberal, argued the cause, and *H. Hobble, Jr.,* and *Chester A. Nordling,* both of Liberal, were with him on the briefs for the appellant.

*Donald R. Newkirk,* of Wichita, argued the cause, and *A. E. Kramer* and

*Bernard E. Nordling*, both of Hugoton, and *Homer V. Gooing, Wayne Coulson, Paul R. Kitch, Dale M. Stucky, Robert J. Hill, Gerrit H. Wormhoudt, Philip Kassebaum, John E. Rees, Robert T. Cornwell* and *Willard B. Thompson*, all of Wichita, were with him on the briefs for the appellee.

The opinion of the court was delivered by

WERTZ, J.: This is an action brought under the provisions of the guest statute (G. S. 1949, 8-122b) by plaintiff (appellee), Carlos Perry, against defendant (appellant), Terry Lee Schmitt, to recover damages for personal injuries sustained by plaintiff while riding in an automobile driven by defendant.

Plaintiff's petition alleged that defendant was guilty of certain enumerated acts of gross and wanton negligence which were the proximate cause of his injuries. Defendant's answer denied the allegations and alleged that plaintiff voluntarily participated in and consented to all the acts and conduct of defendant and voluntarily assumed the risk therefrom. Plaintiff, by way of reply, denied these allegations.

The case proceeded to trial upon the issues thus joined. Evidence was introduced by the parties and the cause was submitted to the jury, which returned a general verdict for the plaintiff in the sum of $19,500, and at the same time returned answers to special questions submitted by the court, as follows:

"1. Did the liquor and beer consumed by the defendant contribute to the accident in which plaintiff was injured? ANSWER: Yes.

"2. What was the proximate cause or causes of the accident in which plaintiff was injured? ANSWER: High speed.

"3. If you find that excessive speed was a proximate cause of the accident, what do you find such speed to have been in miles per hour? ANSWER: 80 to 85.

"4. [Not material herein.]

"5. Did the plaintiff at the time he went to sleep know how much liquor and beer had been consumed by defendant? ANSWER: Yes.

"6. Did the plaintiff furnish any of the beer and liquor consumed by defendant? ANSWER: Yes.

"7. If you find the defendant committed acts constituting gross and wanton negligence as defined in the Court's instructions: A. Set out the acts constituting such gross and wanton negligence. ANSWER: Too high speed. B. At the time such acts were committed was the defendant indifferent and unconcerned with the possibility of injury to person or property? ANSWER: Yes. C. At the time such acts were committed could the defendant have realized the imminence of danger of injury resulting therefrom if he had exercised the degree of judgment ordinarily exercised by reasonably prudent persons? ANSWER: Yes."

From an order overruling defendant's post-trial motions and from the judgment in plaintiff's favor, defendant appeals.

The pertinent portion of the evidence disclosed by the record follows: Plaintiff and defendant, both minors, had known each other for several years. Plaintiff was on a four-day leave from the Salina Air Base, where he had been on an alert from midnight of December 22, 1955, until 6:00 p. m., December 23, after which he drove to Hugoton and visited with his parents until midnight. About six o'clock on the evening of December 24, after defendant got off work, he and plaintiff went to defendant's home, where he cleaned up and they each had a highball. They later drove around the streets of Hugoton in defendant's 1950 Ford coupé and then decided to drive to Liberal [about thirty-two miles away]. Before they left town, plaintiff bought half a pint of whisky, from which they each had two drinks on the way to Liberal. There they went to the "Supper Club," where they met some friends and drank "two or three beers." They then drove around the town until about 11:00 p. m., when they started back to Hugoton. Defendant was driving "sensibly," and after they left Liberal's city limits plaintiff went to sleep. The next thing he remembered was waking up in the Amarillo Air Base hospital.

On the night of the accident, Highway Patrolman Anderson had stopped a car on the highway (83 and 270) four or five miles north of Liberal, when he heard an approaching car and got off the road. He recognized defendant's car as it passed him and estimated its speed to be between ninety and 100 miles an hour. It was then between 11:30 and 12:00 p. m.

A Mr. Teele and a Mr. Nix testified that about 11:45 that evening they were driving north toward Hugoton on the same highway when they saw a car on its side in a maize stubble field. They stopped and found defendant lying underneath the car. When he was asked if anyone else was in the car with him "he alternated saying yes and no." He said "he was going pretty damn fast and lost control of it." They took him home, after which his mother called the sheriff's office and said she was sure there was another boy out at the wreck.

The sheriff and Patrolman Anderson arrived at the scene of the accident together, where they found plaintiff in the field between "50 and 100 feet north and west of the car." They radioed for an ambulance, which took plaintiff, who was unconscious, to the hospital. Anderson testified that he went east of the scene of the acci-

dent and "found tracks on the left side of the road for a distance of 336 feet off the road on the south side. They were rolling tracks." The car had come back "on the slab and it looked like it turned over in the middle of the road sliding on its top, left the road on the north side 129 feet west . . . where it came back on the south side and then rolled over and came to rest in the maize field 162 feet further west." About 2:00 a. m., December 25, Anderson talked to defendant at the hospital, who admitted having one beer and two drinks of whiskey. He carried on what appeared to be an intelligent conversation and said "he was headed west and felt the car whip and did not remember what happened after that." At a later date defendant admitted he was probably driving eighty-five miles an hour on the night in question.

A complaint was filed charging defendant with driving on the night of the accident in such a manner as to indicate a willful and wanton disregard of the safety of persons and property and transporting a bottle of alcoholic liquor upon which the seal had been broken. He subsequently pleaded guilty to both counts and paid the fine assessed therefor.

The defendant testified that the sheriff had cautioned him several times before this accident about fast driving and told him that if he didn't settle down in his driving he was going to hurt somebody; that the sheriff had gone to his home and talked to him and both of his parents about defendant's driving and had told him that the manner in which he was driving was going to endanger him and other people riding with him; that other people had told him the same thing, but he did not believe the way he was driving was going to hurt anybody. He stated that before this particular accident happened his driving had been a problem to the law enforcement officers of the community and they had been trying to settle him down; that he had been arrested for reckless driving about a week before the night in question.

Plaintiff was severely injured. His father arrived at the hospital about two or two-thirty on the morning of December 25 and found him cold and shaking, and "after they got him warmed up he screamed and yelled and was not rational." The next evening the Air Force took him to Texas, where they strapped him in bed and kept him strapped therein for two or three weeks. It was over a month before he could talk rationally for more than two or three sentences. He had suffered a concussion, a badly shattered right

elbow and a fractured pelvis. Subsequently, two operations were performed on his elbow. Plaintiff testified that he remained in the hospital, under medical treatment, until July, when he was transferred to Denver, where they operated on his arm in December, 1956, but the arm did not improve; that by reason of his injuries he was unable to pass the physical examination to become a pilot, and he still suffers disability. His other injuries and the extent of his suffering need not be related here.

Defendant assigns seven specifications of error. We will treat only those argued in his brief and consider the remainder as waived. This court has repeatedly held that specifications of error which are neither briefed nor argued are regarded as abandoned and on appeal will not be reviewed or considered by this court. (*Brent v. McDonald,* 180 Kan. 142, 300 P. 2d 396; *Lambertz v. Builders, Inc.,* 183 Kan. 602, 331 P. 2d 559.)

Defendant first contends that inasmuch as plaintiff purchased, earlier in the evening in question, a small quantity of liquor out of which they each had two drinks plaintiff thereby participated in the activities of defendant's drinking and, therefore, assumed the risk of injury which barred his recovery.

We cannot agree with this contention. It is conceded by the parties that contributory negligence, if any, on the part of the plaintiff is not a defense to defendant's gross and wanton negligence. (*Long v. Foley,* 180 Kan. 83, 299 P. 2d 63.) The defense of assumption of risk is generally confined to master and servant situations. We have never applied that doctrine as a defense to an action arising under the guest statute and we are not disposed to do so now. Nevertheless, in the instant case, on request of the defendant, this question was, in effect, submitted to the jury by the trial court in instruction No. 4, which in pertinent part reads:

"If you find and believe that the plaintiff induced, participated in or expressly consented to the acts and conduct of defendant which plaintiff alleges to have amounted to gross and wanton negligence, your verdict should be for the defendant. However, the plaintiff's right to recover for the gross and wanton negligence of the defendant is not barred by the failure of the plaintiff to exercise ordinary care for his own safety."

The jury, by the general verdict, determined this question adversely to defendant.

We feel the court's instruction was most favorable to the defendant and he cannot now be heard to complain. Entering an automobile with only the knowledge that the driver has been drink-

ing does not as a matter of law preclude recovery by a guest for injuries arising from the gross and wanton negligence of the driver. For an extensive review on this subject see *Davis v. Hollowell*, 326 Mich. 673, 40 N. W. 2d 641, 15 A. L. R. 2d 1160, and annotation thereto beginning at page 1165.

Defendant next argues that a speed of eighty to eighty-five miles an hour, standing alone, does not constitute gross and wanton negligence. While speed alone is not sufficient to establish gross and wanton negligence, it is properly considered along with other facts and circumstances surrounding the occasion in determining whether defendant was guilty of wantonness. (*Long v. Foley*, supra.)

The jury also found that, in addition to speed, defendant's drinking contributed to the accident and that defendant had been indifferent to and unconcerned with the possibility of injury to persons or property, when he could have realized the imminence of danger of injury resulting from his acts had he exercised the degree of judgment ordinarily exercised by reasonable, prudent persons. The record discloses that defendant, prior to the accident, had been repeatedly warned about his fast driving by the sheriff, highway patrolmen and other persons. At the time, he was driving a 1950 lightweight automobile on a main highway at a speed of eighty to eighty-five miles an hour, after dark, on Christmas Eve when holiday traffic could be expected to be heavy, and after he had been drinking. These and other circumstances, heretofore related, were sufficient to sustain the jury's finding of gross and wanton negligence on defendant's part and to support the general verdict.

In a long line of cases we have held that gross and wanton negligence under the guest statute means wantonness. An act has been held sufficient to constitute wantonness if it indicates a reckless disregard for the rights of others with a total indifference to the consequences, although a catastrophe might be the natural result. Wantonness has been defined many times and the sum total of these definitions has been given in *Bailey v. Resner*, 168 Kan. 439, 442, 214 P. 2d 323, as follows:

". . . a wanton act is something more than ordinary negligence, and yet it is something less than willful injury; to constitute wantonness, the act must *indicate* a realization of the imminence of danger and a reckless disregard and complete indifference and unconcern for the probable consequences of the wrongful act. It might be said to include a willful, purposeful, intentional act, but not necessarily so; *it is sufficient if it indicates* a reckless disre-

gard for the rights of others with a total *indifference* to the consequences, although a catastrophe might be the natural result." [Emphasis supplied.]

For our recent holding on this subject see *Hickert v. Wright*, 182 Kan. 100, 104, 105, 319 P. 2d 152. Therefore, defendant's contention that the court erred in refusing to submit to the jury his requested special question as to whether he actually realized the imminence of danger of injury is without merit.

Defendant also contends that the damages awarded plaintiff were excessive. As heretofore related, plaintiff sustained serious injuries consisting of a severe concussion, a badly shattered elbow and a fractured pelvis. He was unconscious for several days and irrational for over a month, during which time he could talk rationally for only two or three sentences at a time; his right elbow was operated on twice after it had been originally set and he was hospitalized from December, 1955, to December, 1956. Medical testimony revealed that in November, 1956, plaintiff had a permanent disability to his right elbow with thirty per cent limitation of motion in flexion and extension; that in December, 1957, he was found to have a thirty to thirty-five per cent decrease in the strength of his right hand, and as late as February, 1958, the X-rays revealed evidence of marked traumatic arthritis which might produce pain and limitation of motion as he grew older. His lifetime ambition to become an Air Force pilot was frustrated by reason of this permanent disabling injury.

In view of the foregoing and other evidence as to plaintiff's injuries and long suffering, it cannot be said the verdict was excessive. The able trial court approved this verdict, and we find no reason to disturb it.

Other questions argued have been considered and found to be without sufficient merit to warrant a reversal of the judgment rendered. The judgment of the trial court is affirmed.

It is so ordered.