## Richmond

R. A. Blacka v. Edward Jackson James, Administrator, Etc.

November 30, 1964.

Record No. 5776.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

*Wayt B. Timberlake, Jr.* and *Richard W. Smith* for the plaintiff in error.

*Philip Lee Lotz* (*Cochran, Lotz & Black*, on brief), for the defendant in error.

I'Anson, J., delivered the opinion of the court.

This is an action by Edward J. James, administrator of the estate of Colin Kelley James, deceased, to recover for wrongful death by drowning of plaintiff's intestate, which was alleged to have resulted from the negligence of the defendant, R. A. Blacka, owner and operator of Shenandoah Acres, an amusement area and swimming resort in Augusta county, Virginia.

The specific acts of negligence alleged were defendant's failure (1) to have properly trained and an adequate number of lifeguards on duty at the time of the drowning of the deceased; (2) to take prompt and effective action "to locate the person of the deceased" in the lake when notified that he was missing; (3) to provide suitable rescue and safety appliances; and (4) to place signs to indicate the depth of the water.

Defendant's motions to strike the evidence at the conclusion of the plaintiff's evidence and after all the evidence was heard were overruled, but the court limited the issue to be considered by the jury solely to the "adequacy of the lifeguards." The jury returned a verdict for the plaintiff in the amount of $6,000. Judgment was entered on the verdict and the defendant is here on a writ of error.

The basic question presented on this appeal is whether the defendant was negligent in failing to have a sufficient number of trained lifeguards on duty at the time of the drowning, and whether such negligence was the proximate cause of the death of Colin Kelley James.

Under familiar principles, the evidence will be stated in the light most favorable to plaintiff.

The drowning occurred sometime in the late afternoon of Sunday, July 17, 1958, in a lake owned and operated by the defendant, which the general public was invited to use upon the payment of an entrance charge. The lake covered some three acres and was circular in shape. The depth of the water varied from zero at the shore line to a gradually increasing depth of five feet, except in a channel in the center of the lake which was approximately 20 yards wide and 75 yards long, running generally east and west. This rectangular area was marked off by ropes attached to posts placed around the edge of the channel. The posts rose two feet above the water, with the depth of the water within the channel painted thereon, and the deepest part was shown to be 11 feet.

Near the center of the lake, and on the edge of the south side of the channel, there was a tower, 35 feet high, with three different platforms or levels. A series of ladders led to the three platforms. The first platform was some five to six feet from the surface of the water and a diving board extended from it over the deep water. Two cables extended from the top of the tower and were anchored on opposite sides of the shore, and there was a wheel device affixed to one of the cables which patrons would take hold of and ride to the surface of the lake.

On the afternoon of the drowning Colin Kelley James, 15 years of age, and Vance Allen Cline, his 17-year-old friend, went into the lake around 2:30 P.M. They spent their time diving, swimming and riding the cable line from the tower, but they were not constantly together. James was a good swimmer and at no time did Cline or anyone else see him in any difficulty. The last time Cline remembered seeing the James boy was around 4:30 P.M., when he (Cline) was on the top platform of the tower awaiting his turn to ride the cable. At that time he saw James swimming normally toward the tower ten to fifteen feet away. After riding the cable Cline returned to the tower and did not see James around, but thought nothing of it. Sometime later he attempted to locate James and made some inquiries of friends as to where he was, but during that time he did not mention to the defendant, who was at the entrance to the resort area the entire afternoon, or to any of his employees that his friend was missing.

At about 5 P.M. Cline's parents came to the lake to give the boys a ride home. When Cline told his father that he had not seen the James boy for some time, the defendant was asked to page him over the public address system, which was done promptly, and Cline's father made several telephone calls to ascertain if James had left the grounds with someone else. Upon failing to locate him, a check of the bathhouse was made and his clothes were found. Thereafter defendant's lifeguards began a search in the roped-off area of the lake, and his body was found about ten feet from the tower, in nine feet of water.

The county medical examiner testified that death was due to drowning; that there were no visible marks on the body; and that the time of death was about 4:35 P.M.

Cline testified that he did not see any lifeguards on duty at the lake during the afternoon, but "I cannot state for sure whether they were really there or not." When asked if there were any lifeguards on

duty at the tower, he replied, "No, sir, none that I seen at the tower at all."

There was testimony from some six witnesses that they did not see any lifeguards on duty the afternoon young James was drowned. All of these witnesses except one knew the James boy, but only one of them saw him in or near the lake at any time during that afternoon.

It was estimated that there were from 300 to 500 people in the lake during the afternoon, but not one of them saw the James boy in any difficulty whatever or heard any cry of distress.

Five witnesses testified on behalf of the defendant that they were on duty as lifeguards at various times during the afternoon the boy was drowned. Some of them alternated their duties between working at the concession stand and some of the cottages which overlooked the lake and serving as lifeguards. There was also testimony that at no time during the entire afternoon were there fewer than three lifeguards on duty as such. Each of them was a qualified lifeguard and wore a senior life-saving emblem on his or her bathing trunks.

The facts present a case of first impression in this Commonwealth.

■ The general rule is that the owner of a swimming pool or lake to which the general public is invited for a consideration must exercise ordinary care for the safety of his patrons. He must make reasonable provisions to guard against those accidents which common knowledge and experience teach are likely to befall those engaged in swimming and other aquatic sports for which he has provided facilities, but the owner is not an insurer of the safety of his patrons. 4 Am. Jur. 2d, Amusements and Exhibitions, § 84, pp. 207-209; 86 C. J. S., Theaters & Shows, § 42f, p. 736; 4 Sherman and Redfield on Negligence (Rev. Ed.), § 644, p. 1562; Annotation: "Bathing Resort-Liability," 48 A. L. R. 2d 104, § 3, pp. 111-116, and the many cases there cited.

The plaintiff urges us to apply the doctrine of *res ipsa loquitur* under the facts of the present case. He concedes that the application of this doctrine is a minority view, but argues that it is the better one and says it was applied in the case of *Rome v. London & Lancashire Indemnity Co. of America*, La. App., 169 So. 132, 141. There it was held that when a person drowns in a swimming pool there is a presumption that if the lifeguards had been performing their duty they would have discovered the decedent's peril in time to save his life. This doctrine was expressly rejected in *Hecht v. Des Moines Playground & Recreation Ass'n*, 227 Iowa 81, 287 N. W. 259, 268,

and we also hold that it has no application under the facts of this case. To hold otherwise would make the owner and operator of a swimming pool or lake, open to the public for a consideration, an insurer of the safety of his patrons and be contrary to the great weight of authority.

■ There was evidence, however, from which the jury could find that the defendant did not exercise ordinary care for the protection of the patrons of the lake and thus he was negligent. But mere proof of an accident and negligence does not establish a cause of action. There must be in addition a causal connection between the negligence and the injury or death complained of. Evidence tending to show a causal connection must be sufficient to remove the case out of the realm of speculation and conjecture and into the realm of legitimate inference before submitting it to a jury for its determination. *Hawkins v. Beecham*, 168 Va. 553, 561, 191 S. E. 640, 643.

It is the universally accepted rule that in negligence cases one of the prerequisites to liability is that a defendant's negligence must have been the proximate cause of an injury or death. Thus it has been held that the mere fact that a person has drowned in a swimming pool or lake, even though the owner and operator is negligent in not using reasonable care to protect his patrons, does not, without more, establish the liability of a defendant. The negligence of the defendant must have a causal connection with the drowning, and in the absence of a showing that a defendant's negligence was the proximate cause of the death there can be no recovery. See *Hecht v. Des Moines Playground & Recreation Ass'n, supra; Swan v. Riverside Bathing Beach Co.*, 132 Kan. 61, 294 P. 902, 904; *Mullen v. Russworm*, 169 Tenn. 650, 90 S. W. 2d 530, 532; *Hahn v. Perkins*, 228 N. C. 727, 46 S. E. 2d 854, 857, 858; *Lyman v. Hall*, 117 Neb. 140, 219 N. W. 902.

Thus the crucial question is whether the plaintiff's evidence supports the jury's verdict that the negligence of the defendant was the proximate cause of the drowning of young James.

The evidence shows that when the James boy was last seen he was swimming normally and there was no indication that he was in distress. None of the several hundred people in or around the lake saw James in distress or heard him make an outcry. He simply disappeared below the surface of the water without anyone observing when, how or why. Surely if there had been any indication that the boy was in trouble someone in the lake would have come to his rescue or given an alarm. When Cline did not see the James boy

after returning to the tower he was not alarmed and had no cause to believe that he had drowned. No report was made to the defendant or to any of his employees that James was missing until some thirty minutes after Cline had missed him.

Lifeguards are to aid those in distress, and unless there is some cause to believe that one is in distress they cannot be expected to act. It cannot be inferred, without resorting to pure speculation, that if there had been one lifeguard, or any number of lifeguards, on the tower or around and in the lake, James would not have drowned. The facts are not such as would indicate with reasonable probability that the drowning would not have occurred if the defendant had provided an adequate number of lifeguards. This is not a case where a lifeguard failed to do his duty after he knew, or should have known, a swimmer was in distress. It cannot be said, under the facts and circumstances of this case, that any act or omission of the defendant or any of his lifeguards placed young James in a position of danger which was the proximate cause of his death. Hence there was no proof of causal connection between the drowning of the plaintiff's decedent and the negligence of the defendant.

Since the trial court limited the jury's consideration of the negligence of the defendant to the adequacy of the lifeguards, and there was no cross assignment of error, we need not consider the other allegations of specific acts of negligence. Rule 5:1, § 5.

For the reasons stated, the judgment is set aside, the case reversed, and final judgment is here entered for the defendant.

*Reversed and final judgment.*