Leo **BURGERT** and Mrs. Leo Burgert,
Plaintiffs-Appellees,

v.

Jerry **TIETJENS** and Terry Tietjens, Individually and as partners d/b/a Sycamore Springs Recreation Area, Defendants-Appellants.

No. 73–1928.

United States Court of Appeals,
Tenth Circuit.

Argued May 17, 1974.

Decided July 3, 1974.

**2**

J. Roger Hendrix, Topeka, Kan. (Herbert A. Marshall, Topeka, Kan., on the brief), for plaintiffs-appellees.

Howard A. Spies, Topeka, Kan., for defendants-appellants.

Before LEWIS, HOLLOWAY and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

Jerry Tietjens and Terry Tietjens, individually and as partners d/b/a Sycamore Springs Recreation Area, appeal from a judgment in a diversity action tried to the court, awarding the parents of the decedent, (appellees here), Robert Burgert, the sum of $30,539.95 under the Kansas Wrongful Death Statute, K. S.A. 60–1901 to 60–1905 (1967).

On August 24, 1969 the Burgerts were engaged in a farming operation near Pawnee, Nebraska. That day their son Robert, age 12, travelled with a church-sponsored group of youngsters and several adult supervisors from Pawnee City, Nebraska, to the Sycamore Springs Recreation Area owned and operated by the appellants near Sabetha, Kansas. The group had planned a late after-noon of swimming, picnicking, and rollerskating at the facility following their arrival.

At approximately 4:00 p. m. following arrival, Robert and a companion, John Neal, went to the swimming pool. They paid admission and shared a basket to store their clothes while swimming. Robert was last seen alive by John Neal at approximately 5:00 p. m. while playing in the shallow end of the pool. At approximately 5:30 p. m. an adult supervisor of the church group called the children from the pool for a picnic supper. Some of the youngsters, including John Neal, did not leave the pool area immediately, however. When young Neal departed the pool at about 6:00 p. m. he discovered that Robert's clothes were

still present in their shared basket. Neal returned to the pool area where he unsuccessfully searched for Robert before proceeding to the picnic. He did not mention to any of the adults that Robert's clothes were still in the basket until some time later that evening. While Robert apparently did not eat at the picnic supper, his absence went unnoticed.

A search for Robert began when one of the appellants' lifeguards discovered Robert's clothes still in the basket at approximately 9:30 p. m. after the pool had been closed. His body was discovered by divers shortly thereafter at the bottom of the pool in about six feet of water. Futile attempts were made at that time to resusitate the boy. Cause of death was determined as drowning by the doctor summoned to the scene; however, no autopsy was performed and there was a conflict in the testimony as to how thorough an examination was performed by the doctor in reaching his conclusion. The condition of the body indicated that Robert's death had occurred more than two and one-half hours prior to its recovery from the pool. Prior to the discovery of the body, none of the lifeguards, occupants of the pool, or spectators had observed any signs of distress in the pool area.

The pool was approximately 75 feet in width and 140 feet in length, divided by a rope with colored buoys near the middle of the pool, separating the shallow from the deep end. The depth of the pool ranged from two feet in the shallow end to ten feet in the deep end. It was supplied by water from natural springs which had resulted, up until a year prior to Robert's death, in a condition of such poor water clarity that the bottom of the pool could not be seen. The appellants had installed a water filtration system a year prior to Robert's death to alleviate this situation. However, for unexplained reasons, on the date in question the water clarity was such that a person could not see below the surface of the water beyond a maximum depth of two and one-half to three feet, and could not,

therefore, see the bottom of the pool at the point where Robert's body was discovered. Various witnesses described the water condition that day as being "cloudier than usual" (Tr., Vol. 3, p. 39); "very murky" (Tr., Vol. 3, p. 127); "cloudy; kind of green" (Tr., Vol. 3, p. 39). This water condition was known to appellants prior to the time the pool was opened to the public at 1:00 p. m. on August 24, 1969.

The court below found that: the cause of Robert's death was in fact drowning; Robert was a business invitee in the swimming pool, and as such was owed a duty by the appellants to use ordinary and reasonable care for his safety; the appellants breached that duty when they allowed patrons in the pool on August 24, 1969, at a time when the water was so cloudy that the bottom of the pool could not be seen; that Robert's body would have been visible from the surface had it not been for the cloudy condition of the water; that proper safety standards would require a lifeguard to be able to see the bottom of the pool; that patrons should not be allowed in a swimming pool if the condition of the water is such as to render it impossible to see the bottom thereof in the deep end; that appellants' lifeguards could not perform their duty of underwater surveillance and rescue because of the water condition; that the cloudy condition of the water constituted negligence on the part of the appellants, and that this negligence was the proximate cause of Robert's death. Further, the Court found neither Robert Burgert himself, nor the appellees, to be guilty of contributory negligence, and that Robert had not assumed any risk by swimming in the pool.

On appeal it is contended that the trial court erred: (1) in finding that Robert met his death by drowning; (2) in finding that the water condition constituted negligence and was the proximate cause of Robert's death; (3) in not charging Robert with contributory negligence or assumption of the risk; (4) in assessing the amount of damages

awarded; and (5) in establishing standards of care for swimming pool operators absent statutory or case authority to support those standards.

## I.

Appellants contend the trial court erred in determining that appellees had shown by a fair preponderance of the evidence that Robert met his death by drowning. This contention is apparently predicated upon discrepancies in the record as to the thoroughness of the examination made of Robert's body by Dr. Virgil E. Brown, the attending physician, preceding his conclusion that the cause of death was drowning. Testimony as to the scope of this examination ranged from that of Dr. Brown, on deposition, as intensive, consuming 10 to 15 minutes, during which he checked for eye signs, examined skin coloration, made use of a stereoscope, checked for water in the lungs, etc., to that of other witnesses as simply a cursory examination of the general appearance of Robert's body lasting five minutes or less. Without Dr. Brown's testimony, appellants allege, the evidence reveals only that Robert Burgert died, and not that he died from drowning.

■ The findings of a trial court will not be reversed on appeal unless they are clearly erroneous. Transwestern Pipeline Company v. Kerr-McGee Corporation, 492 F.2d 878 (10th Cir. 1974); Woods v. North American Rockwell Corporation, 480 F.2d 644 (10th Cir. 1973); Rule 52(a) Fed.R.Civ.P. 28 U.S.C.A.

■ Apart from the testimony of Dr. Brown, which the trial court indicated it had not exclusively relied upon, the record reveals the following: (1) Robert was in good health prior to August 24, 1969; (2) his body was discovered in six feet of water at the bottom of the pool; (3) his body was stiff and blue when brought out of the water; (4) the hands were closed over the abdomen and the legs flexed at the knees; (5) no bruises or abrasions indicating external trauma were found on the body; and (6)

no suggestion other than death by drowning was offered or inferred from these facts. The existence of these factors, in combination with the finding of death by drowning made by Dr. Brown, leads us to conclude there was substantial evidence to support the finding of death by drowning made by the trial court. The testimony by the appellants' expert witness, a pathologist, to the effect that drowning was only a possibility, does not materially detract from the sufficiency of this evidence.

## II.

Appellants contend the trial court erred in finding that the water condition constituted negligence and was the proximate cause of Robert's death.

■■ Appellants correctly cite Swan v. Riverside Bathing Beach Co., 132 Kan. 61, 294 P. 902 (1931), for the proposition that under Kansas law the owner of a swimming pool open to the public is not an insurer of those making use of the pool. Such owner is liable, however, for injury or death due to his negligence. Swan v. Riverside Bathing Beach Co., *supra*, at 903. Kansas has defined negligence as the failure to exercise care as the circumstances justly demand. Rowell v. City of Wichita, 162 Kan. 294, 176 P.2d 590 (1947); Elliot v. Chicago, Rock Island and Pacific Railroad Company, 203 Kan. 273, 454 P.2d 124 (1969). The standard of care for the owner of a public beach is "to use reasonable care under the circumstances and to *provide appliances reasonably fitted for the purpose for which they were to be used*." (Emphasis added). Vukas v. Quivira, Inc., 166 Kan. 439, 201 P.2d 685, 688 (1949).

■ The Kansas courts have defined proximate cause as "that which naturally leads to, and which might have been expected to be directly instrumental in, producing the result." Rowell v. City of Wichita, *supra*, 176 P.2d at 596, citing Consolidated Electric Light & Power Co. v. Koepp, 64 Kan. 735, 68 P. 608 (1902). While the negligence

charged must have been the proximate cause of the injury, Rowell v. City of Wichita, *supra*; Cooper v. Eberly, 211 Kan. 657, 508 P.2d 943 (1973); Steele v. Rapp, 183 Kan. 371, 327 P.2d 1053 (1958), the inquiry as to whether there was proximate cause is to be determined on the facts of each case, and is to be answered in accordance with common sense and common understanding. Rowell v. City of Wichita, *supra*. It is normally a question of fact for the jury. Elliot v. Chicago, Rock Island and Pacific Railroad Company, *supra*.

Appellants' reliance upon those cases holding that a pool owner's negligence is not established where it is shown by the evidence that the lifeguards were exercising reasonable care, is misplaced. As noted by the trial court, the charge of negligence is predicated here not upon any act or omission by appellants' lifeguards, but rather upon the fact that these lifeguards were practically prevented from acting to effectuate a rescue due to the condition of the water in the pool.

> The Court finds no evidence to sustain a claim that the guards were negligent in performing their duties. A dozen guards present at the pool would have been unable to detect a swimmer in difficulty in the deep end of the pool. The negligence in this case consisted of permitting the pool to operate with the water in such a cloudy, murky condition that the lifeguards present could not perform their functions and duties.

(Tr., Vol. 1, p. 57).

Appellants further contend that the trial court, of necessity, had to resort to speculation in its finding that the clarity of the water was the proximate cause of the failure of the lifeguards to perform a rescue. We disagree. Appellants' reliance, in this regard, on Nolan v. Young Men's Christian Ass'n., 123 Neb. 549, 243 N.W. 639 (1932), is unwarranted. The Nebraska Supreme Court in that case did in fact find that one would have to resort to conjecture as to whether a "dark" water condition, caused by the absence of two lights in the pool, was in any way the proximate cause of the drowning there in question. However, the critical distinction between that case and the present one is that there the court specifically found:

> The proof is that, when notice was given that Nolan was missing, the guard *was able to see his body at the bottom of the pool* and promptly recover it. (Emphasis added).

243 N.W. at 642.

The inference is that, had the guard not been able to see the body, a finding of proximate cause could have been arrived at without resorting to conjecture. The evidence in this case is unrefuted that Robert's body could not be seen at the bottom of appellants' pool. It would seem to be a justifiable inference that this condition materially interfered with any possible rescue activity.

After a careful examination of the entire record we are convinced that the trial court's findings, that appellants were negligent in opening the pool to the public when they knew a cloudy water condition existed which might interfere with the duty of their lifeguards, and that this condition was the proximate cause of Robert's drowning, were fully warranted by the evidence and constitute a reasonable application of the Kansas law of negligence and proximate cause set out above.

### III.

Appellants contend the trial court erred in not charging Robert with contributory negligence or assumption of risk.

Considering first assumption of risk, we agree with the trial court that nothing in the record indicates that Robert "knowingly" placed himself in peril of an "appreciated" danger as required under the test prescribed in the leading Kansas case of Kleppe v. Prawl, 181 Kan. 590, 313 P.2d 227 (1957). The fact that Robert or other patrons of the

pool did not object to the condition of the water does not necessarily lead to the inference that Robert knew or appreciated the danger he was being exposed to. Where different inferences may be drawn, appellate courts will not substitute their judgment for that of the trial court. Hodgson v. Okada, 472 F.2d 965 (10th Cir. 1973); Colby v. Cities Service Oil Company, 254 F.2d 665 (10th Cir. 1958).

We would, perhaps, go further. The Kansas Supreme Court has intimated that the doctrine of assumption of risk would not be available as a defense in a negligence action such as this even if knowledge and appreciation of the danger could be shown. In Perry v. Schmitt, 184 Kan. 758, 339 P.2d 36 (1959), the Kansas court stated:

> The defense of assumption of risk is generally confined to master and servant situations. We have never applied that doctrine as a defense to an action arising under the guest statute and we are not disposed to do so now.

339 P.2d at 39.

And in Shufelberger v. Worden, 189 Kan. 379, 369 P.2d 382 (1962):

> In the instant case the defendant failed to show that there was any employer-employee relationship or any contractural relationship, express or implied; nor can it be found in the record that plaintiff received any benefit from the transaction, and in order for assumption of risk to be a defense one or more of the aforementioned conditions must exist. Defense counsel cite no authority where the defense of assumption of risk has been applied in a tort action such as the instant case, and in our limited research we have failed to discover any such authority.

369 P.2d at 386–387.

See also Ballhorst v. Hahner-Foreman-Cale, Inc., 207 Kan. 89, 484 P.2d 38 (1971). While it might be argued that Robert had received a benefit in the form of the privilege to swim in appellants' pool, this is no greater than the benefit received by one riding in a car as a guest, and yet in the latter cases the defense has not been allowed, Perry v. Schmitt, supra. The type of benefit received necessary to allow the defense would seem then to have to be more in the nature of a pecuniary benefit to the plaintiff. No such relationship or "benefit received" existed in the present case.

Finally, in Smith v. Blakey, 213 Kan. 91, 515 P.2d 1062 (1973), the Kansas Supreme Court succinctly stated:

> Defendant concedes the doctrine of assumption of risk is generally confined to a master-servant relationship. We believe it should remain so confined . . . . We do not abandon the doctrine because its application is deeply imbedded in our master-servant case law . . . ; but we refuse to broaden its application to other situations.

515 P.2d at 1070.

Considering next the issue of contributory negligence, the test under Kansas law as to the contributory negligence of children is set down in Weber v. Wilson, 187 Kan. 214, 356 P.2d 659 (1960):

> The rule of law with respect to the negligence of an adult and that of a child of tender years is quite different. Children of tender years are not held to the same strict accountability of an appreciation of danger and of need for care of themselves as persons of full age, but are required to exercise such care as persons of their age, experience, capacity and intelligence are ordinarily expected to exercise under like circumstances . . . the question of capacity of a particular child at a particular time in avoiding a particular danger is one of fact, falling within the province of a jury to determine. . . .

356 P.2d at 663–664.

See also Morlan v. Smith, 191 Kan. 218, 380 P.2d 312 (1963); Riley v. Holcomb, 187 Kan. 711, 359 P.2d 849 (1961); Krentz v. Haney, 187 Kan. 428, 357 P.2d 793 (1960).

■ The fact that Robert and other invitees made use of the very facility they had paid an admission fee to use, without objecting to its condition, does not lead to a necessary inference of contributory negligence. Robert had a right to assume that the appellants had performed their duty to provide "appliances reasonably fitted for the purpose for which they were to be used", and a right to assume that if the pool was not in a reasonably safe condition he would have been warned. Campbell v. Weathers, 153 Kan. 316, 111 P.2d 72 (1941).

There is no evidence that Robert was using the facility in any manner inconsistent with appellants' invitation, manifested by their opening the pool to the public on August 24, 1969; the pool was open when Robert arrived and lifeguards were on duty; others were swimming in the pool; Robert had not been in the pool previously and could not have known what the normal water condition was; the condition of the water at the shallow end of the pool where Robert entered was not as cloudy as at the deep end.

Under these circumstances we cannot say that the trial court was clearly erroneous in finding that Robert, by merely entering the pool, was exercising such care as persons of his "age, experience, capacity and intelligence" would ordinarily have been expected to exercise.

## IV.

■ Appellants allege the trial court committed clear error in assessing damages in amount of $30,539.95 where no direct evidence of "dollar value of a loss of life" was offered by the appellee.

The general statement as to the measure of damages in an action for the wrongful death of a child is set forth in Bartlett v. Heersche, 204 Kan. 392, 462 P.2d 763 (1969):

The measure of damages for the wrongful death of any person is difficult for a jury to compute. When children of tender years are involved the difficulty is compounded. Questions as to how to compensate for the mental anguish, suffering or bereavement of parents . . . are questions which the legislature has wisely placed in the hands of the court and jury.

462 P.2d at 772.

In Roda v. Williams, 195 Kan. 507, 407 P.2d 471 (1965), the court stated:

We recognize that the loss recoverable is not to be limited to pecuniary loss . . . no definite and precise rule can be applied and the matter of assessment of damages in a case such as this must necessarily be left to the judgment and common experience of the jury, to be guided by the facts and circumstances.

407 P.2d at 477.

In accord, the applicable Kansas statute provides:

In any such action, the court or jury may award such damages as are found to be fair and just under all the facts and circumstances . . . .

K.S.A. 60–1903.

Appellees did not produce any direct evidence of pecuniary loss resulting from the death of their son. It has been held, however, that in the death of a minor living with his parents there is an implication of pecuniary loss in addition to an implication of loss due to bereavement and mental anguish. Corman v. Weg Dial Telephone, Inc., 194 Kan. 783, 402 P.2d 112 (1965). While no evidence of pecuniary loss was present in Roda v. Williams, *supra*, the jury award was upheld.

In Atchison, T. & S. F. Ry. Co. v. Fajardo, 74 Kan. 314, 86 P. 301 (1906), the court held:

It is not essential to a recovery in the case of a child that there should be proof of valuable services already rendered, nor direct evidence of the exact value of the services which would have been rendered had he lived, nor yet a fixed amount of pecuniary loss sus-

tained in his death. This is not practicable.

86 P. at 304.

When we consider the testimony given as to Robert's age, intelligence, conduct and relationship with his parents, we hold that the appellees proved a basis for the reasonable expectation of lost pecuniary benefit resulting from the death of Robert. In addition, there was ample testimony in the record indicating the non-pecuniary loss suffered by appellees of the type enumerated in K.S.A. 60–1904.

Our review of the record as a whole discloses that the trial court did not err in its award of damages in the amount of $30,539.95.

## V.

Appellants allege the trial court erred in setting standards of water clarity for swimming pool operators in Kansas absent Kansas statutes or case authority to support those standards.

■ We first note that a federal district judge sitting as a state trial judge in a diversity action, may, where there exists no specific state law in point, look to other states' laws in his effort to reach the same result that would probably be reached were the question to be litigated in a state court. Symons v. Mueller Company, 493 F.2d 972 (10th Cir. 1974); Cottonwood Mall Shopping Center, Inc. v. Utah Power & Light Company, 440 F.2d 36 (10th Cir. 1971), cert. denied, 404 U.S. 857, 92 S.Ct. 107, 30 L.Ed.2d 99 (1971). While the trial court indicated it did not rely upon the laws of any other states, its reliance, if any, upon those standards of care required in other states would not constitute error.

■ In any event, the trial court's specific finding that proper safety standards would require a lifeguard to be able to see the bottom of the swimming pool and to scan his area of assignment every 30 seconds, would appear to be only supplementary to its basic finding that in this case the inability of the lifeguards to see more than three feet below the surface of the pool constituted negligence. The prior finding is not essential and merely suggests a standard which might have been adopted had the case been tried in state court. This anticipation of state law is not fatal under these circumstances.

Finally, appellants' reliance on the assertion that the water in the pool was in "as good or better" condition than that of other pools in the area, is not conclusive. Kansas has adopted the following rule as to "customary conduct" from 65 C.J.S. Negligence § 16:

> The common usage of a business or occupation is a test of care or negligence, and is a proper matter for consideration in determining whether or not sufficient care has been exercised in a particular case, at least where the conduct in question is not *inherently dangerous*; but customary methods or conduct do not furnish a test which is conclusive or controlling on the question, and *negligence may exist notwithstanding* the conduct pursued or the methods adopted were in accordance with those customarily pursued or adopted. (Emphasis added).

Morrison v. Kansas City Coca-Cola Bottling Co., 175 Kan. 212, 221, 263 P.2d 217, 224 (1953); Blackmore v. Auer, 187 Kan. 434, 357 P.2d 765 (1960).

■ We think the record here would support a finding under this test that the water condition in the pool was inherently dangerous or otherwise constituted actionable negligence notwithstanding the customary conduct of other pool operators in the area concerning water condition.

Affirmed.