## Richmond

S & C COMPANY, T/A THE PALMS APARTMENTS AT MALIBU,
ETC. V. MARY ANN HORNE, ADMINISTRATRIX, ETC.

June 10, 1977.

Record No. 760572.

Present: All the Justices.

*John F. Rixey* (*Rixey and Heilig,* on brief), for plaintiff in error.

*Grover C. Wright, Jr.* for defendant in error.

PoFF, J., delivered the opinion of the Court.

This appeal arises from a final order entered January 9, 1976 confirming a jury verdict awarding Mary Ann Horne, Administratrix of the Estate of Robert Ricky Lovett, Deceased (plaintiff), $30,711.75 in damages. The order was entered upon a motion for judgment for wrongful death filed against S & C Company, t/a The Palms Apartments at Malibu, a Virginia General Partnership, whose partners are Marvin Simon and Herbert Cashvan (defendant).

Defendant provided a swimming pool for the use of residents of its large apartment complex. Shaped in the form of a four-leaf clover and eight feet in depth at its deepest point, the pool was 60 feet long and 50 feet wide with a surface area less than 2,000 square feet. Under regulations promulgated pursuant to the city code, owners of such pools were required to "have on duty a reliable and competent person as life guard . . . whose sole duty is observation and protection of bathers"; to place an elevated lifeguard chair at the edge of the deep end of the pool; and to maintain water clarity sufficient to enable a person at a distance of 30 feet to observe a black and white disc six inches in diameter placed at the bottom of the deep end of the pool.

On August 29, 1975, at 5:00 p.m., plaintiff's decedent, Robert Lovett, aged 14, who had never visited the pool before, was admitted by Edward Hamilton who was employed by defendant as "a pool attendant". Hamilton, a 36-year-old graduate of four accredited life-saving courses, holder of a "senior lifesaver's badge" with previous experience as a lifeguard, watched Lovett for 10 to 15 minutes to be sure he could swim. From time to time over a period of one to two hours, he saw Lovett "splashing around, playing," and diving for a rock or penny in the deep water. During this period, the pool was being used by five or six other swimmers, including Margaret Holland and her two daughters, Chris and Sherry. Mrs. Holland testified that "[t]here was a young child there playing with us, and she came up from the bottom and said, 'There is somebody on the bottom. There is a boy on the bottom.' " Mrs. Holland asked her daughter Sherry, aged 12, to dive to the bottom to make sure the child "wasn't pulling our leg." On her second dive, Sherry located a body, and on the third dive, she lifted Lovett to the surface where Mrs. Holland pulled him to the edge of the pool. Mrs. Holland shouted to Hamilton to send for the rescue squad.

Hamilton, who had been sitting with a group of people on the deck at the shallow end of the pool and eating ice cream, ran to the edge, lifted Lovett from the water, pulled his tongue from his mouth, and "administered respiration" by a process he described as "[s]tomach hold, chest push." There was no resuscitation equipment at the pool, and Hamilton did not attempt the mouth-to-mouth technique "because when I cleared his throat, he was frothing, and I didn't want to choke him." Hamilton gave a bystander a coin and told her to call the rescue squad. The rescue squad, stationed only two city blocks from the pool, arrived in "a couple of minutes", attempted unsuccessfully to revive Lovett, and took him to the hospital where he was pronounced dead as a result of drowning.

A forensic pathologist testified that a person under water "would lose consciousness quite rapidly, but heart action could continue for, say, three to five minutes." Mrs. Holland testified that she had last seen Lovett "splashing" in the water 5 to 10 minutes before he was discovered on the bottom of the pool. Asked if there was any "indication of any distress", she replied, "Only the splashing." She said that it was her "impression" that he was just "playing around", but that she had "thought about that moment many times since August, and it's worried me." Hamilton testified that he last saw Lovett "two, three, four, five minutes" before he was discovered and had not seen or heard any signs of distress. Asked if he could have seen the body lying at the bottom of the pool beneath the elevated lifeguard chair if he had been occupying the chair, Hamilton answered, "No, sir. It's on a direct line with the late afternoon sun." Asked to explain why the portable chair had not been moved to place the sun at his back, Hamilton replied that he did not know. Harry Lively, defendant's employee, testified that a photograph introduced by defendant showed the position occupied by the chair on the day of the drowning and, referring to the photograph, agreed that it was not located at the water's edge.

According to Mrs. Holland and Sherry, the pool was "cloudy" and Mrs. Holland said that, although she was wearing a diver's mask, she was unable to see the bottom. The bottom was painted "pale blue", and Lovett was black. A sanitarian with the city health department testified that the pool had been "voluntarily closed down most of the month of June" to repair faulty seals on the water filters and that, on another visit in August, he had

found the pool closed. Hamilton testified that "[o]nce the filters in the pool malfunctioned, and it was closed down; and once the water was murky and was closed down." Another worker employed by defendant said that he had closed the pool twice during the swimming season because the "water was cloudy two times."

Challenging the trial court's rulings against its motions to strike the evidence and enter summary judgment, defendant contends that "plaintiff's evidence does not show that the negligence of the defendant was a proximate cause of the death of the decedent".

■ The negligent breach of a duty is actionable only when it constitutes a proximate cause of an injury. We consider first the nature of the duty the plaintiff-landlord owed the defendant-tenant under the circumstances of this case.

> "The general rule is that the owner of a swimming pool or lake to which the general public is invited for a consideration must exercise ordinary care for the safety of his patrons. He must make reasonable provisions to guard against those accidents which common knowledge and experience teach are likely to befall those engaged in swimming and other aquatic sports for which he has provided facilities, but the owner is not an insurer of the safety of his patrons. (Citations omitted)." *Blacka* v. *James*, 205 Va. 646, 649, 139 S.E.2d 47, 50 (1964).

By parallel logic, the same rule applies to a landlord-owner of an apartment complex who, as part of the consideration for rental payments, provides a swimming pool for the use of his tenants. *Smith* v. *Jung*, 241 So.2d 874 (Fla. App. 1970); *see also Raponotti* v. *Burnt-Mills Arms Inc.*, 113 N.J. Super. 173, 273 A.2d 372 (1971).

■ Under the common law rule, and depending upon the circumstances involved, an owner's duty to provide for the safety of paying patrons *may* include a duty to station qualified lifeguards at the pool to supervise patrons and rescue those in peril. *Brotherton* v. *Manhattan Beach Improvement Co.*, 48 Neb. 563, 67 N.W. 479 (1896), *aff'd on rehearing*, 50 Neb. 214, 69 N.W. 757 (1897). In such case, the pool owner is liable for the negligence of lifeguards in the performance of their duties.

*Blackwell* v. *Omaha Athletic Club,* 123 Neb. 332, 242 N.W. 664 (1932).

Our opinion in *Blacka* implicitly acknowledged that this common law rule applies in Virginia, and here the duty to employ at least one qualified lifeguard was expressly imposed by law. Plaintiff does not challenge Hamilton's qualifications, and we consider what duty such a lifeguard owes to the paying patrons he is employed to supervise.

The duty is two-fold. First, he has some duty to observe swimmers for signs of distress; second, he has some duty at some point to attempt rescue of those in distress.

With respect to the second duty, it has been held:

"A life guard who goes to the rescue of a patron or guest owes the duty of exercising ordinary care; that is, such care as would be used by an ordinarily cautious life guard under like circumstances. . . ." *Blackwell* v. *Omaha Athletic Club, supra,* 123 Neb. at 333, 242 N.W. at 666.

Here, the evidence was sufficient to support the conclusion that, after Hamilton was told that the submerged body had been discovered, his conduct satisfied this standard of care. Looking to his conduct before that time, we must define the nature and extent of his duty to observe swimmers for signs of distress.

In *Blacka* v. *James, supra,* we reversed a judgment for the plaintiff because there was no evidence of causal connection between the defendant's negligence and the drowning. Addressed as it was to causal connection, our holding in that case was carefully limited. "This is not a case", we said, "where a lifeguard failed to do his duty after he knew, or should have known, a swimmer was in distress." *Id.,* 205 Va. at 651, 139 S.E.2d at 51.

■ What that language implies we now hold expressly. When the owner of a swimming pool to which patrons for a consideration are invited is required by law to employ a qualified lifeguard, or when in the exercise of his common law duty to provide for the reasonable safety of his patrons, such owner is required by circumstances to do so, the standard of care required of the lifeguard is the care ordinarily exercised in similar circumstances by a qualified lifeguard to detect signs of distress; when distress is discovered, or in the exercise of such

care should have been discovered, the same standard of care applies to the duty to attempt a rescue; and if the breach of such duty proximately results in injury or death, the owner is liable for the lifeguard's negligence.

Applying this rule, we consider next whether there was evidence from which the jury could have found that Hamilton "should have discovered" Lovett's distress.

■ At the time Mrs. Holland last observed Lovett, she did not recognize his "splashing" as a sign of distress. Later, reflecting on the incident, she was "worried" that it might have been. If the "splashing" was, indeed, a sign of distress, it would have been recognized as such by a qualified lifeguard. Even if the "splashing" had no ominous significance and Lovett was beneath the surface of the water when he first experienced difficulty, it is reasonable to infer that he struggled to save himself and that a qualified lifeguard would have recognized his struggle for what it was.

Whatever signs of distress there may have been, Hamilton did not see them. Plaintiff argues that if Hamilton had positioned the elevated lifeguard chair facing away from the setting sun, placed it at the water's edge as regulations required, and remained seated in the chair, he would have been able to observe any signs of distress in the water directly beneath him.

> "We do not say that the proper performance of his duties requires a lifeguard to continuously occupy the post provided for him or that he may not properly give attention to some other duties which do not materially interfere with his duties as a lifeguard. But in determining whether defendant exercised ordinary care . . . the fact that the other duties of the guard apparently prevented him from occupying the lifeguard's seat is an element to be considered in connection with the other evidence." *Langheim* v. *Denison Fire Dept. Swimming Pool Ass'n.*, 237 Iowa 386, 392, 21 N.W.2d 295, 298 (1946).

■ No lifeguard duties called Hamilton from his post, and his absence and his failure to reposition the chair properly were circumstances which the jury could properly consider, in context with other circumstances, in determining whether he should have seen Lovett's distress.

■ The other circumstances are significant. The sun was shining. The pool was small. Nothing obstructed Hamilton's view. And only six swimmers were in the water. From such circumstances, the jury could have found that the reason Hamilton failed to see Lovett in distress was that he was preoccupied in conversation with his friends. Or, the jury could have believed that the "cloudy" condition of the water prevented Hamilton from seeing what he otherwise would have seen. If the jury reached either conclusion, or both, defendant was liable for the negligent conduct which prevented Hamilton from seeing what he should have seen.

Defendant urges us to hold as a matter of law that the evidence fails to establish causal connection between the negligence and the drowning.

■ Unless there is no evidence to support a finding of proximate cause or the evidence leaves no room for reasonable minds to differ, proximate cause is a question of fact to be determined by juries rather than judges. Proximate cause was held to be a jury question in a suit for wrongful death by drowning where the water was cloudy, *Burgert* v. *Tietjens*, 499 F.2d 1, 5 (10th Cir. 1974), and in several cases where a lifeguard failed to see what he should have seen in time to attempt a rescue, *see, e.g., Langheim* v. *Denison Fire Dept. Swimming Pool Ass'n., supra; Meridian Amus. Conc. Co.* v. *Roberson*, 188 Miss. 136, 193 So. 335 (1940); *Lipton* v. *Dreamland Park Co.*, 121 N.J.L. 554, 3 A.2d 571 (1939).

Defendant relies upon *Blacka* v. *James, supra*, where as we have said, we reversed a plaintiff's judgment because there was no evidence to support the jury's determination of proximate cause. There, a swimmer drowned in a three-acre lake occupied that day by 300 to 500 patrons under the supervision of several lifeguards. We held that "[t]he facts are not such as would indicate with reasonable probability that the drowning would not have occurred" if the owner of the lake had provided additional lifeguards. *Id.*, 205 Va. at 651, 139 S.E.2d at 51. There was no evidence whatever to show that the lifeguards present violated their duty to maintain a reasonable lookout, that they should have known that one of the hundreds of swimmers in the spacious lake was in distress, or that the presence of additional lifeguards would have enhanced the probability of timely detection. Absent such evidence, we found that the jury's

determination of proximate cause was based upon "pure speculation".

■ Here, on the other hand, there was ample evidence to show that, for one or more reasons, Hamilton did not see what a qualified lifeguard reasonably should have seen. A forensic pathologist testified that the heart action of a person in Lovett's position would continue for three to five minutes after he lost consciousness; Hamilton testified that he last saw Lovett as little as two minutes before he was discovered at the bottom of the pool. We are of opinion that the jury could have found from such evidence that, but for the cloudy water, the improper position of the lifeguard chair, and Hamilton's preoccupation with activities which distracted him from the performance of his duties, there was a "reasonable probability that the drowning would not have occurred".

Defendant assigned no error to the instructions on negligence and proximate cause, and we hold that the trial court did not err in overruling defendant's motions to strike.

*Affirmed.*

HARRISON, J., concurring.

The opinion of the majority unnecessarily makes an owner of a commercial swimming pool virtually an insurer of its patrons' safety in contravention of our holding in *Blacka* v. *James,* 205 Va. 646, 139 S.E.2d 47 (1964). There we expressly rejected the doctrine of *res ipsa loquitur* as applying to swimming pools and held that:

"Lifeguards are to aid those in distress, and unless there is some cause to believe that one is in distress they cannot be expected to act. . . ." 205 Va. at 651, 139 S.E.2d at 51.

As in *Blacka,* there was no indication in this case that decedent, Lovett, was in distress. The sole fact that he had been "splashing" in the pool does not provide such proof. To conclude otherwise would be to engage in the type of surmise and conjecture expressly rejected in *Blacka* and places an unreasonable and impractical duty upon lifeguards.

On the other hand, the owners of the pool, in violation of a city ordinance, maintained a pool which was so "cloudy" that

decedent's body could not be seen at its bottom. The fact that the owners had previously sought to alleviate this dangerous condition evidenced their knowledge thereof. The legitimate inference follows that had the pool been clear enough to discern a body at the bottom of the pool, someone in or around the pool would have seen the decedent and come to his rescue or given an alarm at a time earlier than was done in this case.

In *Burgert* v. *Tietjens*, 499 F.2d 1, 5 (10th Cir. 1974), the court, in a case similar to this one, concluded:

> "The inference is that, had the guard not been able to see the body, a finding of proximate cause could have been arrived at without resorting to conjecture. The evidence in this case is unrefuted that [decedent's] body could not be seen at the bottom of appellants' pool. It would seem to be a justifiable inference that this condition materially interfered with any possible rescue activity."

Without eroding the principles enunciated in *Blacka*, this case should be affirmed on the ground that there is sufficient evidence for the jury to have found that the proximate cause of decedent's death was the negligent maintenance of the pool in an unsafe condition.