**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ESTATE OF ARTHUR KNIGHT, III, by
and through Arthur Knight, Jr.,
Administrator,
<u>Plaintiff-Appellee,</u>

No. 98-1778

v.

GEORGE STEVEN HOGGARD,
individually,
<u>Defendant-Appellant.</u>

ESTATE OF ARTHUR KNIGHT, III, by
and through Arthur Knight, Jr.,
Administrator,
<u>Plaintiff-Appellant,</u>

No. 98-1847

v.

GEORGE STEVEN HOGGARD,
individually,
<u>Defendant-Appellee.</u>

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Tommy E. Miller, Magistrate Judge.
(CA-97-474-2)

Argued: March 1, 1999

Decided: June 15, 1999

Before WILKINS and TRAXLER, Circuit Judges, and
FABER, United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Reversed and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Alan Brody Rashkind, FURNISS, DAVIS, RASHKIND & SAUNDERS, P.C., Norfolk, Virginia, for Appellant. Michael Ruxton Strong, THE STRONG LAW FIRM, Chesapeake, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

In the early morning hours of March 3, 1990, Officer George Steven Hoggard ("Hoggard") and two other officers observed Arthur Knight, III ("Knight") and Lionel Avant ("Avant") breaking into a parked car. A short time later, Hoggard pursued Knight on foot across the parking lot in an attempt to apprehend him. The parties dispute whether Hoggard fired his weapon at Knight as he fled; however, all agree that Knight soon outran Hoggard, escaping over an embankment and across a nearby interstate highway (I-64). This was the last time, as far as the parties know, that Knight was seen alive. Hoggard stopped his pursuit short of I-64 and returned to his vehicle. Knight's body was discovered thirteen days later in a drainage canal on the other side of I-64. He had drowned, but no one knows how or when. Knight had not been shot.

More than seven years later, Knight's father, as administrator for his son's estate ("the Estate"), brought this action against Hoggard, maintaining that Hoggard used excessive force in violation of Knight's civil rights, see 42 U.S.C.A. § 1983 (West Supp. 1998), and

2

asserting state claims for assault, wrongful death, and gross negligence.[1] Hoggard filed a motion for summary judgment based on the statute of limitations and the lack of proximate cause, but the district court denied the motion. At trial, Hoggard again sought dismissal on these grounds, but to no avail. However, the district court dismissed the § 1983 claim as a matter of law. See Fed. R. Civ. P. 50(a). Likewise, the district court dismissed the Estate's claims for punitive damages. The jury then found against Hoggard on the state claims.

On appeal, Hoggard contends that, among other errors, the district court erred in concluding that this action was not barred in its entirety by the applicable statute of limitations and that there was sufficient evidence to establish that Hoggard's actions proximately caused Knight's subsequent drowning death. The Estate cross appeals, contending in part that the district court erred in dismissing the § 1983 claim and the claim for punitive damages as a matter of law. Because we agree with Hoggard's contentions, we need not analyze the issues raised by the Estate in its cross appeal. Accordingly, we reverse and enter judgment in favor of Hoggard.

I. FACTUAL BACKGROUND

The facts, viewed in a light most favorable to Knight, are these. Hoggard was assigned with his partner, William B. Everett, to the Narcotics Squad of the Norfolk Police Department. At some point after midnight on March 3, 1990, Hoggard and Everett, both dressed in plain clothes, met in an unmarked police van with a third officer, Derek Young ("Young"), who was making undercover drug purchases. While Hoggard and Everett were meeting with Young, they noticed Knight and Avant studying cars parked in the Met Park parking lot where the police van was parked. Eventually, Knight broke into one of the cars while Avant served as a lookout. Upon seeing the break-in, Hoggard drove the van toward Knight and Avant, stopping approximately 25 to 50 yards away from them. With Young still inside, Hoggard and Everett got out of the van, allegedly with their handguns drawn and without identifying themselves as police officers.

_____

[1] The Estate's claims for assault and wrongful death were combined into one count in the complaint.

3

Knight and Avant fled in different directions. Everett ran after Avant while Hoggard chased Knight. The Estate contends that Hoggard discharged his sidearm several times during his pursuit of Knight, emptying his clip of ammunition. Nevertheless, Hoggard neither shot nor stopped Knight, who ran up a wooded embankment toward I-64. Hoggard then gave up the chase. As Knight ran across I-64, a Virginia highway patrolman, who happened to be in the area, spotted Knight and, using a loudspeaker, ordered him to stop. Knight kept running. There was no evidence that Knight was ever seen alive again. Hoggard returned to the van where he learned that Everett had been unable to apprehend Avant.

After eluding the police, Avant returned home. Knight, however, failed to return home, prompting his father to contact Avant the following day. Avant reported that he had been with Knight the previous evening and that they had been chased and shot at by two white males. As he discussed the incident with Knight's father, Avant ostensibly did not know that the two unidentified males were police officers.

Fearing for his son's safety, Knight's father, accompanied by Avant, went to the Norfolk Police Department to report the incident. Avant admitted to an officer that he and Knight had been in the process of breaking into a car when they were approached, pursued, and fired upon by two white males. Officers T.D. Melton ("Melton") and R.J. Graupmann ("Graupmann") subsequently took Avant and Knight's father to Met Park, where the incident had occurred, to search the area. Hoggard learned about Melton's search and drove to Met Park also. Hoggard, who was still dressed in plain clothes, privately told Melton that he and Everett were, in fact, the men who chased Avant and Knight but that they had not fired their weapons during the pursuit. Melton then reported to Knight's father that the unidentified males were, in fact, police officers and that they had not fired any shots. Melton suggested that the shots Avant claimed to have heard had likely come from a nearby police firing range. Melton, however, did not specifically identify Hoggard and Everett as the officers involved in the chase, and Knight's father did not inquire as to the identity of the officers. Melton subsequently opened a missing person file on Knight.

4

On March 16, 1990, two weeks after Knight's father and Avant met with Melton and Graupmann, Knight's body was discovered floating in a drainage canal on the other side of I-64 from Met Park where Hoggard had chased Knight. The drainage canal was separated from I-64 by another wooded embankment, a wire fence, and a level area approximately 25 to 30 feet wide. An autopsy revealed that the cause of death was asphyxia by drowning; no bullet wounds were found.

Nearly five years later, Young, who had remained inside the unmarked van during the chase, contacted Knight's father and told him that Hoggard was the officer who had chased his son. Moreover, Young told Knight's father that Hoggard had indeed fired his weapon at Knight and had actually returned to the van with an empty clip. Hoggard allegedly admonished Young to keep the incident to himself, which Young did until the fall of 1995.[2] Young testified that he did not learn of Knight's death until that time. Knight's father considered Young's information to be verification of Avant's claim that the officers had shot at them during the chase.

Bolstered by this information, Knight's father, as administrator of the Estate, filed this action against Hoggard, some seven years following Knight's death, asserting a § 1983 claim for excessive force. He also filed state claims for assault, wrongful death, and gross negligence. Hoggard moved on several occasions to dismiss the action as barred by the applicable statute of limitations. The district court rejected his argument each time, concluding that Hoggard had concealed facts from the Estate necessary to establish a cause of action and, therefore, the two-year statute of limitations had been tolled. Additionally, Hoggard sought summary judgment on the basis that there was no evidence establishing a causative link between Hoggard's conduct and Knight's death, an argument that the district court likewise rejected. At trial, Hoggard sought dismissal of the Estate's claims in part on these same grounds pursuant to Rule 50 of the Federal Rules of Civil Procedure. The district court again refused to dismiss the action on these grounds.

_____

[2] Hoggard contends that he and Young had experienced work-related problems shortly before Young went to Knight's father.

5

## II. THE STATUTE OF LIMITATIONS

Hoggard first challenges the district court's ruling regarding the applicability of the statute of limitations. Our review of the district court's denial of a Rule 50 motion is de novo. See Sales v. Grant, 158 F.3d 768, 775 (4th Cir. 1998). In denying Hoggard's motion for summary judgment, the district court concluded -- and the parties do not dispute -- that a two-year limitations period applied to each of the Estate's claims. With respect to the § 1983 claim, the statute of limitations is imported from state law. See Wilson v. Garcia, 471 U.S. 261, 266-69 (1985); Nasim v. Warden, Md. House of Correction, 64 F.3d 951, 955 (4th Cir. 1995) (en banc). Here, Virginia's two-year personal injury limitations period applies to the Estate's§ 1983 claim. See Lewis v. Richmond City Police Dep't, 947 F.2d 733, 735 (4th Cir. 1991); see Va. Code Ann. § 8.01-243 (Michie 1993). Likewise, under Virginia law, a two-year limitations period applies to wrongful death claims, see Va. Code Ann. § 8.01-244 (Michie 1993), claims for assault, and claims sounding in negligence, see Va. Code Ann. § 8.01-243. The parties disagree, however, whether this two-year limitations period operates to bar this action.

### A. Accrual of the Claims

### 1. The § 1983 Claim

Although the applicable limitations period for a federal civil rights claim is determined by reference to state law, "the question of when a cause of action accrues under 42 U.S.C.§ 1983 remains one of federal law." Nasim, 64 F.3d at 955 (emphasis in original). "[F]or purposes of a § 1983 claim, a cause of action accrues either when the plaintiff has knowledge of his claim or when he is put on notice -- e.g., by the knowledge of the fact of injury and who caused it -- to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim." Id. Thus, the applicable statute of limitations begins running "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Id.; see also Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996).

The Estate suggests that Knight's father did not possess sufficient knowledge to bring a claim until Young revealed Hoggard's identity

6

to him, confirming that Avant had truthfully asserted that Hoggard and Everett discharged their weapons during the pursuit. In view of the record, we find these contentions unpersuasive.

The Estate has had evidence since 1990 that a police officer in plain clothes without identifying himself fired shots at Knight as he chased Knight near Met Park. There was obviously, also, knowledge of Knight's death. This evidence was without question enough to put the Estate on notice of both the fact of injury and, under the Estate's theory of the case, knowledge as to who caused it. The statute of limitations began running right then. The "new" evidence obtained by the Estate which precipitated the lawsuit seven years later was the identification of Hoggard as the particular officer who had allegedly fired the shots, along with the corresponding testimony of Young. This evidence might have made the Estate's case stronger, but given the information available to the Estate from the beginning, its discovery did not affect the running of the statute of limitations. Since the initial incident, the Estate had known it was a Norfolk police officer who had chased Knight. Knowledge of the name of the officer was not determinative of the accrual of the action, particularly in light of the fact that it was easily attainable. Young's testimony was only corroborative of Avant's testimony and, consequently, was not necessary to establish an element of the claim since Avant's testimony had been available to the Estate from the beginning.

Perhaps the Estate did not believe its evidence was strong enough to bring an action in 1990, but that with the addition of Young's testimony in 1997 it was. Regardless, the statute of limitations begins to run when a plaintiff has knowledge of his claim, not when the plaintiff obtains evidence that is strong enough to convince him that he can prevail. We conclude that, as of March 16, 1990, the Estate had sufficient knowledge that a reasonable inquiry would have revealed its potential cause of action. Therefore, this claim accrued no later than that date, and the filing of the § 1983 claim was well past the two-year statute of limitations.

2. The State Claims

In Virginia, a "right of action [is] deemed to accrue and the prescribed limitation period shall begin to run from the date the injury

is sustained in the case of injury to the person." Va. Code Ann. § 8.01-230 (Michie Supp. 1998). Virginia does not follow the discovery rule under which the limitations period does not begin to run until an injury has been discovered or should have been discovered. See Nunnally v. Artis, 492 S.E.2d 126, 129 (Va. 1997). Therefore, the two-year statute of limitations began running at the time of the Estate's injury, i.e., at the time of Knight's death. Since Knight died no later than March 16, 1990, the statute of limitations for these claims expired long before this action was filed.

B. Equitable Estoppel

The Estate contends that its action was timely because the limitations period was tolled by the doctrine of equitable estoppel. Under Virginia law, a defendant is equitably estopped from raising a statute of limitations defense when the defendant has obstructed the plaintiff from asserting his claim by fraudulently concealing the potential cause of action. See Boykins Narrow Fabrics Corp. v. Weldon Roofing & Sheet Metal, Inc., 266 S.E.2d 887, 890 (Va. 1980). A party seeking to invoke the doctrine must prove the following elements by clear, precise, and unequivocal evidence:

> (1) A material fact was falsely represented or concealed; (2) The representation or concealment was made with knowledge of the fact; (3) The party to whom the representation was made was ignorant of the truth of the matter; (4) The representation was made with the intention that the other party should act upon it; (5) The other party was induced to act upon it; and (6) The party claiming estoppel was misled to his injury.

Id.

We cannot agree with the Estate that equitable estoppel applies here. First, the Estate was not ignorant of the facts to support its claim. Knight's father possessed knowledge of all of the facts needed to investigate and bring a claim against Hoggard. As explained previously, he was aware of Avant's allegations that Hoggard fired shots during the chase. Second, Hoggard made no attempt to conceal his identity; he revealed to Melton that he and Everett had been involved

8

in the chase, and Melton reported to Knight's father that the unidentified men had been police officers. The fact that Hoggard denied firing any shots is not the type of "misrepresentation" upon which the principle of equitable estoppel turns. Indeed, Hoggard testified under oath at trial that he fired no shots and he continues to maintain that to this day. The dispute, then, over whether shots were fired is not unlike the type of dispute that underlies every trial -- one side contends that events happened in a certain way and the other side asserts a contrary version. Equitable estoppel comes into play when a party conceals a fact that prevents a potential plaintiff from having evidence necessary to prove a claim, or an element thereof. Here, the Estate already had in its possession evidence that Hoggard had fired shots. Young's testimony merely corroborated what the Estate already knew, and consequently the Estate could not use estoppel as a basis for avoiding its responsibility to bring a timely action.

In sum, Hoggard simply did not deprive the Estate of"`its power to assert [its] cause of action in due season,'" id. at 889 (quoting Brunswick Corp. v. Perkinson, 151 S.E. 138, 140 (Va. 1930)), or "obstruct[ ] the prosecution of [its] suit," id. at 890, which is what the doctrine of equitable estoppel is designed to prevent. See also Va. Code Ann. § 8.01-229D (Michie Supp. 1998) (tolling the limitations period when the defendant has used "direct or indirect means to obstruct the filing of an action"). We are satisfied that the statute of limitations was not tolled by the doctrine of equitable estoppel.**3**

_____

**3** We reject the Estate's contention that Hoggard somehow waived the statute of limitations defense. Indeed, he seems to have raised it at every possible procedural juncture. Nevertheless, the Estate argues -- in direct contradiction to the position it took before the district court -- that the issue of whether Hoggard is estopped to plead the statute of limitations is a jury issue and, therefore, Hoggard waived this issue when he failed to offer a jury instruction on estoppel. We are satisfied that the resolution of the statute of limitations issue was one for the court -- just as the Estate suggested below. As we have explained, there is simply no genuine issue of material fact to be resolved with respect to the application of the equitable estoppel doctrine.

9

III. PROXIMATE CAUSE

Hoggard also challenges the district court's denial of his motion for judgment as a matter of law based on the dearth of evidence establishing proximate cause.**4** The Supreme Court of Virginia has explained that "[t]he proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." Coleman v. Blakenship Oil Corp., 267 S.E.2d 143, 147 (Va. 1980) (quoting Beale v. Jones, 171 S.E.2d 851, 853 (1970)). Although evidence supporting proximate cause need not be scientifically exact, it "must be sufficient to remove the case out of the realm of speculation and conjecture and into the realm of legitimate inference before submitting it to a jury for its determination." Blacka v. James, 139 S.E.2d 47, 50 (Va. 1964)."[M]ere proof of an accident and negligence does not establish a cause of action." Id. Hoggard argues the evidence was insufficient precisely because of the lack of evidence in the interim: no one knows when or how Knight drowned. We agree with Hoggard. Although the autopsy revealed that Knight had been submerged for some time when his body was discovered two weeks after the chase, it requires sheer speculation to conclude that Knight's drowning was the natural consequence of anything Hoggard did. There was simply no evidence of it. Nor was there any evidence that would allow the jury to do any more than guess at how the drowning occurred. Indeed, a number of scenarios

_____

**4** Hoggard represents to the court in his opening brief that he made an appropriate motion to the district court under Rule 50 for judgment as a matter of law as to proximate cause. Because of the paucity of materials contained in the joint appendix, however, we are unable to ascertain whether this is so -- it is clear only that Hoggard argued there was insufficient evidence of proximate cause in his summary judgment motion, which was denied. See Chesapeake Paper Prod. Co. v. Stone & Webster Eng'g Corp., 51 F.3d 1229, 1237 (4th Cir. 1995) (explaining that the denial of a summary judgment motion is not reviewable once there has been a full trial on the issue and that a party seeking review of such an issue must move for judgment as a matter of law under Rule 50). Nevertheless, the Estate does not challenge Hoggard's representation that the issue of proximate cause was properly preserved for review. On that basis -- and because our analysis of proximate cause does not affect the disposition in the case -- we will consider Hoggard's contention on appeal that there was insufficient evidence of proximate cause to allow this action to go to the jury.

10

seem equally likely. Perhaps Knight successfully avoided Hoggard and waited for his pursuers to depart, only to drown some time later as a result of tragic carelessness. We are only guessing, however, like the jury was required to do. The only certain evidence concerning Knight's death is that he did not die from a gunshot wound inflicted by Hoggard or anyone else. Rather, Knight drowned at an unknown time, in an unknown manner, and for an unknown reason. See id. at 50-51 (concluding that plaintiff lacked proximate cause because there was no evidence of how boy drowned, requiring the jury to speculate). Because the evidence was simply insufficient to establish proximate cause, we conclude that the district court should have awarded judgment as a matter of law to Hoggard on this basis as well.

## IV. SUMMARY

The Estate raises several issues in its cross appeal. In light of our conclusion that this action was barred by the statute of limitations, and that the Estate lacked sufficient evidence of proximate cause as to any of its claims, we need not reach the issues raised by the Estate. Accordingly, we reverse the district court's denial of Hoggard's motion for judgment as a matter of law and remand with instructions that judgment be entered in favor of Hoggard.

REVERSED AND REMANDED

11