COURT OF APPEALS OF VIRGINIA

Present:   Judges McClanahan, Haley and Beales
Argued by teleconference


TERRY LYNN SULLIVAN

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1886-08-3                      JUDGE JAMES W. HALEY, JR.
                                                         JANUARY 19, 2010

COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
                            Victor V. Ludwig, Judge

           Dana R. Cormier for appellant.

           Jennifer C. Williamson, Assistant Attorney General (William C.
           Mims, Attorney General, on brief), for appellee.


      Terry Lynn Sullivan ("Sullivan") appeals her conviction for animal cruelty in violation of

former Code § 3.1-796.122.  Her sole argument is that there was insufficient evidence for

conviction.  For the following reasons, we affirm.

                                           I.

                                        FACTS

      On April 10, 2008, Sullivan was the President of the Fern Leigh Equine Foundation

("The Foundation"), a not-for-profit horse rescue organization in Augusta County, Virginia.  The

foundation's horses lived on a farm owned by Sullivan.  Sullivan testified that the purpose of the

foundation was to care for horses that did not have homes, and to attempt to place them with new

owners.  The foundation was funded by donations and by the occasional sale of horses.  One of

the animals kept at the foundation's Augusta County property was a 20-year-old mare named

Dip.

_____
      * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Brigette Berbes ("Berbes") testified that she was driving down Interstate 81 around noon on April 10 when she saw a horse on Sullivan's pasture that was lying on the ground. Berbes, a local horse enthusiast, was familiar with Sullivan and the foundation. At about seven in the evening of the same day, Berbes drove past the same pasture and saw that the horse had not moved and remained lying on the ground. According to Berbes, she called her mother to ask her to call Sullivan and to inform Sullivan that she was going to enter Sullivan's property and look at the horse. Berbes testified that the horse was extremely thin, and was so weak that it could not lift its head off the ground, and could not reach the hay, the grain, or the small pan of water that Berbes saw behind the horse.

By nine o'clock, Sullivan and Animal Control Officer Gary Webb ("Webb") were with Berbes in the field beside the horse. Webb testified that he went to Sullivan's property in response to a complaint that there was a downed horse. According to Webb, "[Sullivan] said the horse had been down for about 30 hours. That was a statement she made to me." Berbes asked Sullivan to just give the horse to her, so that Berbes could take care of it. Sullivan replied that she would give Berbes the horse, provided that Berbes took over responsibility for any veterinary bills. Webb prepared, and Sullivan and Berbes both signed, a document styled "surrender statement by owner," which is in the record. The document purports to relinquish all rights Sullivan might have in a "Bay mare – 18 years old." It reads, in part: "Relinquish property rights to Brigette Berbes who will be responsible for vet bills – and will vacate property when the vet leaves."

From Sullivan's property, Berbes also phoned Dr. Scott Reiners ("Reiners"), a veterinarian at Mountain View Equine Hospital. Part of Reiners' testimony reads as follows:

> Q:     Okay. Would you describe the horse that you saw – I
>         mean, in terms of its condition?

A:	He was down in left recumbency, nonresponsive to any stimuli, very dehydrated and emaciated.

Q:	Did you administer IV fluids to the horse?

A:	Yes. We started IV fluids along with other drugs to try to supplement him and get him back into a norm – more normal state. He wouldn't . . . The horse couldn't pick up its head, so by the time we got some of the drugs and things in there, it was – we were able to hold it up sternally, but still weak.

Q:	Why – why did you use IV fluids instead of just giving it a bucket of water?

A:	He wouldn't raise up his head, and so there . . . I don't think he could even pick up his head to drink.

Q:	Do you remember how much you administered in the way of fluids?

A:	22 liters out there, and then when he got to the hospital, we gave more. He got another six liters at the hospital, which was – he was just on a constant IV drip the whole time.

*	*	*	*	*	*	*

Q:	In your opinion, was the horse in need of emergency veterinary care?

A:	Yes.

Q;	And the emergency, was that an emergency that happened suddenly, or what was the precipitating nature of the emergency?

A:	Weakness, lethargy, almost in a comatose state, so – and dehydration. I mean, that horse could have used care long before that.

Q:	So would you say that the condition that the horse was in had a sudden onset?

A:	No.

Despite Reiners' efforts, the horse died later that night.

At Sullivan's trial, Reiners was one of three veterinarians to testify, and each of them was qualified as an expert witness in the field of veterinary medicine. Dr. David Brown testified that he conducted a post-mortem examination on Dip and later wrote a report on the results of his examination, which was admitted into evidence. According to Dr. Brown's report, Dip suffered from many diseases, including myocardial fibrosis, which in his testimony he described as "damage to the heart cells"; hepatic fibrosis; endometritis or an inflammation of the lining of the uterus; and parasites of the small and large intestine. Dr. Brown testified that the cause of death was cardiac fibrosis and colitis.

The Commonwealth also introduced into evidence a chart from the American Humane Association describing nine levels of equine development, ranging from level 1 ("poor") to level 9 ("very fat"). Dr. Brown testified that, in his opinion, Dip was somewhere between levels 1 and 2 at the time of his post-mortem examination. The chart describes a level 1 horse as follows: "animal extremely emaciated; no fatty tissue can be felt." A horse at level 2 ("very thin") has "prominent ribs," "tailhead prominent," and neck and withers (upper back) that are "faintly discernible." Also present in the description of a level 2 horse is the note: "animal emaciated." Dr. Brown testified that it would have taken two to three weeks for Dip to have reached this condition. When Sullivan testified, she was also questioned about the chart. She said she thought Dip was somewhere between level 4 ("moderately thin) and level 5 ("moderate").

Sullivan testified that Dip was an old horse with a history of being stubborn. She said that, in late March of 2008, she found Dip lying on the ground in her pasture, so she left some food next to Dip. About six hours later, she said that Dip was back on her feet and appeared to be in good health. On April 9, the day before Ms. Berbes encountered Dip, Sullivan again found Dip lying down and refusing to get up. She gave Dip food and water and called Julie Lord ("Lord"), another member of the foundation. Later that evening, Sullivan and Lord discussed

- 4 -

Dip and took a photo of the horse, which was later admitted into evidence. Sullivan stated that Dip appeared "alert" and "bright-eyed," but continued to refuse to stand up. According to Sullivan and Lord, they left food and water for Dip, and decided to check on her again the next day.

The next morning, April 10, Sullivan found that Dip remained on the ground. By noon Dip was lying on her side and could not lift her head high enough to reach the bucket of water that Sullivan had brought for her. When she noticed this, Sullivan replaced the bucket with a shallow pan, about six inches high, and filled it with about two gallons of water so that Dip could drink. At one in the afternoon, Sullivan called a veterinarian, Dr. William Hunter ("Hunter"). Aside from her characterization of the Humane Association chart category to which Dip properly belonged, one aspect of Sullivan's conversation with Hunter was the only factual dispute between Sullivan and the other witnesses. According to Sullivan, she explained Dip's condition and advised Hunter that she had had a horse with similar symptoms before, and the vet had recommended euthanasia for that horse. Sullivan said that Hunter advised her to "put the horse down." According to Hunter, he said that he told Sullivan euthanasia would "be an option," but he denied ever telling Sullivan to put down the horse. Hunter explained that he was surprised when Sullivan had told him that the horse had been down for more than a day; most horse owners call the vet immediately when a horse refuses to stand up. Hunter said that he had never known a horse to be "down a day or two and get up and live." However, he also insisted that he would not affirmatively recommend euthanasia without first examining the animal. He also testified that Sullivan never asked that he come to her farm to examine Dip and that he would have come if she had asked him.

According to the testimony of Sullivan and Gary Meeks ("Meeks"), after Sullivan's telephone conversation with Hunter on April 10, Sullivan telephoned Meeks, a friend of hers, to

help her to euthanize Dip. Meeks testified that, when Sullivan called him, Meeks did not have his shotgun with him and first needed to see his sick mother-in-law.

> Q: Were you planning on going [to euthanize the horse] on the evening of April tenth at some point, or what was your plan to take care of . . .
>
> A: Well, the way – the way things were happening, I was afraid it was going to have to be the next morning.

Meeks never came because Berbes, Reiners, and Webb arrived first.

II.

ANALYSIS

On appeal, Sullivan argues that the evidence was insufficient to support the trial court's verdict that she violated former Code § 3.1-796.122. When considering the sufficiency of the evidence on appeal, we give the benefit of all reasonable inferences deducible from the evidence to the party prevailing below. Shropshire v. Commonwealth, 40 Va. App. 34, 38, 577 S.E.2d 521, 523 (2003). It is within the province of the trial judge, as the finder of fact, to assess the credibility of the witnesses and the weight to be given to their testimony. Long v. Commonwealth, 8 Va. App. 194, 199, 379 S.E.2d 473, 476 (1989). We will not set aside the judgment of the trial court unless it is plainly wrong or without evidence to support it. Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987). For the evidence to be sufficient for a conviction it must exclude every reasonable hypothesis consistent with the innocence of the accused. Powers v. Commonwealth, 211 Va. 386, 388, 177 S.E.2d 628, 629 (1970). However, "'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (en banc) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

According to former Code § 3.1-796.122,[1] "[a]ny person who . . . (ii) deprives any animal of necessary food, drink, shelter or emergency veterinary treatment . . . shall be guilty of a Class 1 misdemeanor." Sullivan's argument on appeal focuses on Dr. Brown's report and testimony, particularly the evidence that Dip was an old horse suffering from many diseases. According to Dr. Brown, Dip's liver and intestinal illnesses might have prevented her from effectively absorbing nutrients from the food she ate. Dr. Brown also found fecal matter in Dip's digestive system during his post-mortem examination, which he said suggested that the horse had eaten recently, possibly within a day to a day and a half before her death. Moreover, the evidence was undisputed that Sullivan continued to bring food and water to Dip after Dip went down. She even brought Dip water in a shallow pan after Dip was no longer capable of lifting her head high enough to drink from her bucket. All the witnesses who came to Sullivan's farm the night of April 10 – Berbes, Reiners, and Webb – confirmed the presence of food and water near the horse. Berbes and Reiners also confirmed the presence of the pan, while Webb merely stated that there was "hay and grain and water there at the horse." Taken together, Sullivan argues that the record supports a reasonable hypothesis of innocence: she did not starve Dip of food or drink in violation of the statute, as the Commonwealth argued at trial. Instead, Dip's illness – or some combination of her many illnesses – prevented her from acquiring nourishment from the food and drink that Sullivan gave to her.

Even if the evidence in the record *is* insufficient to prove that Sullivan starved the horse of food or water, a question we need not decide, Sullivan violated the statute if she failed to provide Dip with necessary emergency veterinary treatment. According to former Code § 3.1-796.66: "'Emergency veterinary treatment' means veterinary treatment to stabilize a life-threatening condition, alleviate suffering, prevent further disease transmission, or prevent

---

[1] Code § 3.1-796.122 was repealed on October 1, 2008 and replaced by Code § 3.2-6570.

further disease progression."[2]  When viewed in the light most favorable to the Commonwealth, we believe the evidence in this case proved that Sullivan failed to provide Dip with necessary emergency veterinary treatment in violation of the statute.

The evidence in the record is that Dip was extremely thin, sick, dehydrated, and unable to move off of the ground.  By the time Dr. Reiners finally arrived to administer veterinary care to the horse, Sullivan had known that Dip was down for more than 30 hours – that was her statement to Webb – and still she had not put down the horse, nor had she summoned a veterinarian to try to save it.  The only veterinary care Dip received came at the behest of Ms. Berbes, not Sullivan, and Dr. Reiners testified that Dip was in serious need of emergency care long before he got there.

Sullivan does not dispute that the expert testimony proved that Dip was a sick horse in need of emergency veterinary treatment.  Yet Sullivan is a layperson, not a veterinarian, and she argues that the Commonwealth failed to prove that it was clearly apparent to her that Dip's illness was an emergency before Berbes complained to animal control and summoned Dr. Reiners.  The text of the statute does not require that the defendant be aware of the animal's need for emergency treatment, and we have not previously considered whether a *mens rea* or *scienter* element is implicit in former Code § 3.1-796.122(A)(ii).  Compare Reed v. Commonwealth, 15 Va. App. 467, 424 S.E.2d 718 (1992) (reading *scienter* requirement into the offense of driving after being declared an habitual offender under Code § 46.2-357); Hensley v. Commonwealth, 7 Va. App. 468, 375 S.E.2d 182 (1988) (holding *mens rea* element is implicit in the offense of tendering bad checks under Code § 58.1-637).  Assuming *arguendo* that a conviction under former Code § 3.1-796.122(A)(ii) requires proof that the defendant knew of the

---

[2] Code § 3.2-6500 (effective January 1, 2009) uses the same definition for "emergency veterinary care."

animal's need for emergency veterinary treatment and then failed to provide that treatment, we hold that the evidence in this case was sufficient for a reasonable finder of fact to determine that Sullivan had the requisite knowledge. To support her argument to the contrary, Sullivan emphasizes Dr. Hunter's statement, on cross-examination, that thin horses are not necessarily sick horses. But as the trial court noted, "Ms. Berbes, who is not a vet but does know horses, had zero trouble telling that this horse was in trouble from the ramp on the interstate." Moreover, Dr. Hunter testified that he was surprised when Sullivan told him that Dip had been down for more than a day. He further testified that it was unusual for horse owners not to summon a veterinarian immediately when a horse goes down and that he had never seen a horse "down a day or two and get up and live."

Sullivan argues that the generally valid inference from Hunter's testimony – that a horse that goes down is ordinarily in serious need of emergency veterinary treatment – loses much of its usual force in this specific case in light of Sullivan's own testimony that Dip was a stubborn horse that went down in late March and got up again after six hours. But the trial judge was not required to believe Sullivan. See Shackleford v. Commonwealth, 262 Va. 196, 209, 547 S.E.2d 899, 907 (2001). "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Elliott v. Commonwealth, 277 Va. 457, 462, 675 S.E.2d 178, 181 (2009). When asked about Dip's place on the Humane Association horse development chart, Dr. Brown testified that Dip was a category 1 ("animal extremely emaciated; no fatty tissue can be felt") or 2 ("very thin") horse. Sullivan said Dip was category 4 ("moderately thin") or 5 ("moderate"). The trial court also strongly disagreed with Sullivan's characterization of Dip as a "bright-eyed" horse in the photograph taken by Lord and admitted as a defense exhibit; the court opined: "If this is the bright-eyed horse that Ms. Sullivan is talking about, I can tell you that her definition of

a bright-eyed horse is different from mine." Given this evidence, the trial court could properly find that Sullivan had a pattern of exaggerating Dip's apparent good health in order to decrease the possibility that she would be convicted. The trial judge, who observed Sullivan's demeanor as she testified, might have found that Sullivan fabricated the March incident or that she exaggerated its importance. Either way, the weight and significance of this evidence was a matter for the finder of fact.

Finally, Sullivan argues that her telephone consultations with Gary Meeks and Dr. Hunter discharged her obligation under the statute to provide her animal with necessary emergency veterinary care. We disagree. Our standard of review requires that we "discard the evidence of the accused" where it conflicts with the Commonwealth's evidence. Holsapple v. Commonwealth, 39 Va. App. 522, 528, 574 S.E.2d 756, 758-59 (2003) (*en banc*). We cannot say as a matter of law that Sullivan's telephone calls to Dr. Hunter discharged her obligation to provide necessary emergency veterinary care, especially when the trial court was entitled to accept Dr. Hunter's testimony that he never told Sullivan to euthanize Dip and that Sullivan never even asked Hunter to come to the farm to examine Dip. Sullivan's later insistence that Berbes assume responsibility for any expenses related to Dip's care suggests that the reasons for Sullivan's failure to summon a veterinarian were financial reasons, rather than ignorance or cruelty. And we do not read into former Code § 3.1-796.122(A)(ii) an obligation on horse-owners to pay the cost of any medical procedure that might conceivably extend the life of even their oldest and sickest animals. But behind the statute is the clear intention to prevent the unnecessary suffering of animals.[3] If Sullivan preferred euthanasia to the costs of veterinary

---

[3] We disagree with the dissent's position that the evidence did not prove that the horse was suffering and that the evidence failed to prove that veterinary care would have relieved that suffering. As we have explained above, whether the cause of her condition was disease or neglect, the evidence was overwhelming that Dip was extremely emaciated and dehydrated, and so weak she could not move her head off of the ground. This evidence permitted the reasonable

care for an old and sick horse, the statute obliged her to spare the horse any unnecessary suffering by putting it down with reasonable promptness.  The evidence in the record shows that Meeks might not have been available to put the horse down until the morning of April 11 or even later.  In the meantime, Dip was lying in the pasture, very sick and emaciated, without even the strength to lift up her head.  The trial court was not plainly wrong in finding that the arrangements Sullivan made failed to satisfy her statutory obligation to provide necessary emergency veterinary treatment for her animal.

III.

CONCLUSION

The trial court did not err in finding the evidence sufficient to prove that Sullivan failed to provide an animal necessary emergency veterinary treatment in violation of Code § 3.1-796.122(A)(ii).  Sullivan's conviction is affirmed.

Affirmed.

---

inference that Dip was suffering.  And the evidence that Dr. Reiners gave the horse IV fluids to relieve her dehydration shows the existence of veterinary treatments capable of alleviating this suffering.

McClanahan, J., dissenting.

I respectfully dissent from the majority's holding because there was no direct or circumstantial evidence presented at trial that appellant deprived Dip of "necessary food, drink, shelter, or emergency veterinary treatment" in violation of Code § 3.1-796.122.[4]  To the contrary, Berbes, Reiners, and Webb all confirmed that appellant had provided Dip food.  The necropsy report indicated that Dip had ingested food "within a day and a half prior to her death."  Berbes, Reiner, and Webb also confirmed that appellant provided Dip with water.  Appellant testified that when she realized Dip could not reach the water in a bucket, she replaced the bucket with a shallow pan.  While the evidence is undisputed that Dip was lying in the field at all relevant times, the Commonwealth presented no evidence regarding what kind of shelter, if any, was located on the premises.

"Emergency veterinary treatment" is defined by Code § 3.1-796.66 as "veterinary treatment to stabilize a life-threatening condition, alleviate suffering, prevent further disease transmission, or prevent further disease progression."  According to the necropsy report, the "life-threatening condition[s]" that in fact caused Dip's death were colitis and cardiac fibrosis.  However, there was no testimony regarding any possible stabilizing treatments for those conditions that would have prevented Dip's death.  Likewise, there was no testimony regarding treatments that would have prevented the progression of those diseases; nor was there any evidence that Dip was suffering from a transmittable disease.  Finally, no evidence was presented

---

[4] "'Circumstantial evidence is proof of a series of other facts than the fact in issue, which by experience have been found so associated with that fact, that, in the relation of cause and effect, they lead to a satisfactory and certain conclusion.'" Byers v. Commonwealth, 23 Va. App. 146, 150, 474 S.E.2d 852, 854 (1996) (quoting Ryan v. Maryland Casualty Co., 173 Va. 57, 62, 3 S.E.2d 416, 418 (1939)).  "Direct evidence, on the other hand, is 'evidence that directly proves a fact, without an inference or presumption, and which in itself, if true, conclusively establishes that fact." Id. at 150, 474 S.E.2d at 854-55 (quoting Black's Law Dictionary 460 (6th ed. 1990)).

that Dip was, in fact, suffering.  Assuming suffering could be inferred, there was no expert medical testimony that emergency veterinary treatment would have alleviated that suffering. The majority, after inferring that Dip was suffering, makes the inference that the admission of IV fluids alleviated such suffering.  No such medical inference, however, "follow[s] naturally from facts proven," and thus it is not an inference that may be "properly drawn" in this case as a matter of law.  Hughes v. Commonwealth, 18 Va. App. 518, 524, 446 S.E.2d 451, 460 (1994) (citation and internal quotation marks omitted); see generally Charles E. Friend, Law of Evidence in Virginia § 10-1, at 354-55 (6th ed. 2003).

By its plain language, the statute only requires emergency veterinary care if it would produce specific positive results in the horse's condition.  "'When the language of a statute is unambiguous, courts are bound by the plain meaning of that language and may not assign a construction that amounts to holding that the General Assembly did not mean what it actually has stated.'"  Atkins v. Commonwealth, 54 Va. App. 340, 344, 678 S.E.2d 834, 836 (2009) (quoting Williams v. Commonwealth, 265 Va. 268, 271, 576 S.E.2d 468, 470 (2003)).  The evidence in this case was insufficient as a matter of law to prove appellant's procurement of emergency veterinary care would have altered the course of Dip's condition.  See Robinson v. Matt Mary Moran, Inc., 259 Va. 412, 417, 525 S.E.2d 559, 562 (2000) (in the absence of "proof of proximate causation, a defendant will not be held liable for the injury or death of another" (citing Farren v. Gilbert, 224 Va. 407, 412, 297 S.E.2d 668, 671 (1982); Roll 'R' Way Rinks, Inc. v. Smith, 218 Va. 321, 329, 237 S.E.2d 157, 162 (1977); S & C Co. v. Horne, 218 Va. 124, 128, 235 S.E.2d 456, 459 (1977))).